O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　Plaintiff,<br><br>　　vs.<br><br>ONE 2006 LAMBORGHINI MURCIELAGO,<br>　　Defendant. | Case No.: SACV 13-0907-DOC (JPRx)<br><br><br>ORDER RE: FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**I.　　Introduction**

A bench trial on this Civil Forfeiture matter was held on May 26, 2015. Plaintiff United States asserts that the defendant asset, a 2006 Lamborghini Mucielago, was subject to forfeiture pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") as a result of the criminal structuring of a cash transaction in violation of 31 U.S.C. § 5324. Claimant, NextGear Capital, asserted a claim in the asset, as the secured creditor of the used car dealer Remate Del Monte, in whose name the defendant vehicle ("Vehicle") was ostensibly purchased. At trial,

NextGear did not substantively challenge the Government's case-in-chief that the vehicle was subject to forfeiture. Instead, it claims that Remate had an interest in the property under California law, and, therefore, NextGear's interest attached to the vehicle pursuant to a security agreement. Pursuant to Rule 52, the Court issues the following findings of fact and conclusions of law.

**II.    Factual Findings**

    **A. NextGear's Security Interest**

1. NextGear Capital, Inc. ("NextGear") had a perfected security interest in the used car dealer NCA International Services, Inc., doing business as Remate Del Monte ("Remate").
2. NextGear was previously known as Dealer Services Corporation ("DSC"), but DSC changed its name to NextGear pursuant to a merger in 2013. References to NextGear include DSC.
3. NextGear provides flooring lines to used car dealers to allow the purchase of inventory (vehicles) for resale to the public.
4. At the time the Vehicle was purchased in 2012, NextGear held a senior, continuing and perfected security interest in all of Remate's assets, including inventory, pursuant to a written Promissory Note and Security Agreement ("Security Agreement") and filed UCC Financing Statements.
5. The Security Agreement provided for "a continuing security interest in all of [Remate's] assets and properties, wherever located, including without limitation, all Equipment of any kind or nature, all vehicles, vehicle parts, all Inventory now owned or hereinafter acquired."
6. Equipment is defined in the agreement to mean "all goods other than Inventory held for sale, lease, or daily rental by Dealer in the ordinary course of business."
7. Inventory is defined as "all Units held by Dealer for wholesale or retail sale, lease, or rent by Dealer, including all Financed Inventory."

8. A Unit, in turn, is "any manufactured item, including vehicles, for which a certificate of title or an MSO exists which is the subject of an Advance by DSC to Dealer under the agreement."

9. An MSO is "the manufacturer's certificate of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit."

10. As of April 20, 2012, Remate's outstanding balance on its flooring line amounted to $233,824.34.

11. Remate's principal, Raul Ernesto Zugasti-Coria ("Zugasti") and his former wife, Cecilia Mariscal, were personal guarantors of the loan to Remate.

### B. Purchase of the Asset

12. On June 1, 2011, 17 separate cash deposits totaling $164,200.00 were deposited to a U.S. Bank National Association ("U.S. Bank") account owned by Lamborghini of Newport Beach ("LNB") in connection with the purchase of the Vehicle, defendant 2006 Lamborghini Murcielago bearing VIN ZHWBU26S9LA02025.

13. The 17 deposits were conducted at 16 different U.S. Bank branches throughout southern California. Each of the 17 cash deposits was for an amount between $9,400.00 and $9,800.00.

14. The Vehicle was purchased using Remate's dealer's license from LNB on June 2, 2011.

15. The LNB salesperson, David Ortiz, recalled that the purchaser, Luis Perez ("Purchaser" or "Perez") did not identify himself as from Remate. He also did not believe that Perez actually worked for Remate. According to testimony from Remate employees, he was not regularly employed by Remate.

16. Perez provided the LNB salesperson with Remate's dealer information to purchase the vehicle as a dealer-to-dealer to purchase (a "wholesale transaction"). These purchases are exempt from sales taxes, and therefore would save the purchaser several thousand dollars (as opposed to if the purchase been a standard retail transaction).

17. The LNB salesperson testified that he was aware of this type of arrangement, where people would borrow an associate's dealer paperwork in order to purchase luxury cars for personal use while avoiding sales taxes.
18. LNB timely submitted a Wholesale Report of Sale to the California Department of Motor Vehicles ("DMV") which identified Remate as the dealer to whom LNB has released its interest. DMV records indicate that LNB sold the Vehicle to Remate on June 2, 2011.
19. On July 15, 2011, LNB disclosed in an IRS Form 8300 that it had received the 17 cash deposits into its U.S. Bank account in connection with the sale of the Vehicle.
20. The Vehicle was eventually delivered directly from the LNB service department to an off-site address in Los Angeles. The address originally provided did not exist, so the Purchaser had to be contacted to obtain a real physical address. The car was delivered to the driver ("Driver") who took delivery of the Vehicle.
21. At the time of delivery, there was still an outstanding balance on the Vehicle of around $3,500.
22. Title was not delivered with the Vehicle, which happens from time to time in dealer-to-dealer transactions. In this instance, title was not delivered because the Vehicle was not fully paid for in June 2011.
23. Remate's principal, Raul Ernesto Zugasti-Coria ("Zugasti") was apparently aware that the Vehicle was purchased in Remate's name. However, people who saw Zugasti frequently only saw him around the Vehicle on one occasion.
24. Eddie Escobedo was an associate of Zugasti. Eddie Escobedo would give money to Zugasti to buy cars; he would also use Remate's dealer's license to buy cars.
25. Mariscal heard rumors that Escobedo was a drug dealer.
26. Mariscal believed Escobedo was the person in possession of the Vehicle in January 2012. She had only seen her husband in the Vehicle once. She believed that if Zugasti did not allow Escobedo to purchase and use the Vehicle, Escobedo would have cut off business with Zugasti.

27. Remate never held the Vehicle in its inventory. Remate did not pay for the Vehicle. It never attempted to sell the Vehicle to a third party. Remate never listed the Vehicle on its website. Before February 2012, Remate never treated the Vehicle as part of its business assets. The Vehicle was not financed by the Claimant as part of Remate's flooring line.

### C. Seizure of the Asset

28. On January 16, 2012, the Irwindale Police Department impounded the Vehicle after the responding officer determined that the Vehicle's dealers' license plate and registration was expired.

29. On or about February 1, 2012, the Vehicle was seized from the Irwindale Police Department by United States Immigration and Customs Enforcement ("ICE") agents pursuant to a federal seizure warrant.

### D. Delivery of Title

30. Sometime in January 2012, Zugasti disappeared and the Remate dealership closed immediately. Zugasti's ex-wife, Mariscal was responsible for disposing of the business and its assets. She nominally owned half of the business. She had no interest in running the business. She had very little involvement in the day-to-day operations of the business prior to Zugasti's disappearance.

31. On January 19, 2012, LNB received $3,500 as a final payment for the Vehicle.

32. Mariscal was contacted by Eddie Escobedo, who she believed to be the possessor of the Vehicle. He told her about the impound.

33. Eddie Escobedo asked Mariscal to retrieve the title for the Vehicle from LNB on his behalf. She picked up the title for him because she was scared of him and he told her to go collect the title. This was the only involvement she had with the Vehicle.

34. The Certificate of Title was issued on February 4, 2012, and reflects a sale date of June 2, 2011.

35. In or around February 2012, Mariscal retrieved the title made out to Remate from LNB.

36. Mariscal was personally liable for the debt owed to NextGear. NextGear employee, Troy Rogers, approached Mariscal about the debt.

37. After Escobedo failed to retrieve the title of the Vehicle from her, Mariscal decided to give the title to the Vehicle to Rogers.

38. NextGear now has possession of the original title wherein LNB released its interest in the Vehicle to Remate.

### III. Conclusions of Law

#### A. Is the Vehicle Subject to Forfeiture?

Plaintiff alleges that the Vehicle is subject to civil forfeiture pursuant to 31 U.S.C. § 5317(c)(2) as a proceed of a violation of 31 U.S.C. § 5324 (anti-structuring statute). The Government must prove by a preponderance of the evidence that the defendant asset is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1).

In order to prove that the Vehicle was a proceed of a violation of 31 U.S.C. § 5324, subject to forfeiture under § 5317, the Government must prove by a preponderance of the evidence that: (1) that the person who deposited the funds, or caused them to be deposited, knowingly structured a currency transaction; (2) that the person who deposited the funds knew of the financial institution's legal obligation to report currency transactions in excess of $10,000; and (3) the person who deposited the funds acted with the intent to evade this reporting requirement. 31 U.S.C. §§ 5313(a) and 5324(a); 31 C.F.R. § 103; *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005); *see also United States v. Peterson*, 607 F.3d 975, 977 (4th Cir. 2010); *United States v. Pang*, 362 F.3d 1187, 1193-94 (9th Cir. 2004).

Congress enacted the Currency and Foreign Transactions Reporting Act ("Bank Secrecy Act") in 1970, Pub. L. 91-2508, Tit. II, 84 Stat. 1118, after hearings concerning "the unavailability of foreign and domestic bank records of customers thought to be engaged in illegal activities." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 21 (1974). The Act imposes a variety of reporting requirements on individuals and institutions regarding foreign and domestic financial transactions. *See* 31 U.S.C. §§ 5311-5325. Federal law requires financial institutions to file a Currency Transaction Report ("CTR") for any cash transaction exceeding

$10,000. 31 U.S.C. § 5313. Structuring a transaction for the purpose of evading a financial institution's CTR reporting requirement is prohibited. 31 U.S.C. § 5324(a).

Furthermore, "[a]ny property involved in a violation of section 5313, [ ] or 5324 . . . and any property traceable to any such violation . . . may be seized and forfeited to the United States in accordance with the procedures governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code." 31 U.S.C. § 5317.

Regulations set forth in 31 C.F.R. § 1010.100 (xx) define when "structuring" occurs:

> For purposes of § 1010.314, a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under §§ 1010.311, 1010.313, 1020.315, 1021.311 and 1021.313 of this chapter. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

31 C.F.R. § 1010.100.

The Court may consider circumstantial evidence, such as the number and pattern of transactions, in determining whether a violator acted with intent. *MacPherson*, 424 F.3d at 189 ("The law, however, recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence"). In *MacPherson*, the Second Circuit found a jury's guilty verdict should not have been set aside as defendants' "willingness to sacrifice efficiency and convenience in depositing a quarter-million dollars through multiple small transactions structured to ensure that no one exceeded $10,000 amply supported a reasonable inference that

1 MacPherson knew of and was intent on avoiding CTR reporting requirement." *Id.* at 191; *see*
2 *also United States v. Van Allen*, 524 F.3d 814, 820 (7th Cir. 2008) (finding that "the sheer
3 volume of the transactions almost compels the [guilty verdict] reached by the jury").

4 The Vehicle was purchased by Perez/Escobedo with 17 separate deposits of just under
5 $10,000 at 16 separate banks all within a one-day period. The Vehicle was purchased by
6 Perez/Escobedo using Remate's dealer's license. While they bought and sold cars in Remate's
7 name from time to time for sale, it is apparent that they also bought and sold cars using
8 Remate's name for their personal use to avoid sales taxes. From the nature of the transaction, it
9 can be reasonably inferred that the person depositing the funds knowingly structured the
10 transaction to avoid the reporting requirements. LNB representatives testified that transactions
11 like this one were exceedingly rare, and not standard for dealer to dealer purchases. Claimant
12 has presented no plausible theory as to why the purchase of this asset was structured in this
13 manner, and there is no reasonable explanation other than the fact that the structured cash
14 deposits were made in order to avoid the reporting requirements. Therefore, one or more
15 violations of 31 U.S.C. § 5324(a) has occurred.

16 The funds from the 17 structured cash deposits made into LNB's U.S. Bank account
17 were used to purchase the Vehicle. Therefore, the Vehicle is traceable to one or more violations
18 of 31 U.S.C. § 5324, and is, therefore, subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

19 The Court concludes that Plaintiff has shown by a preponderance of the evidence that
20 the Vehicle was subject to forfeiture.

21 **B. Was Claimant an Innocent Owner?**

22 Claimant asserts that it is an innocent owner under 18 U.S.C. § 983(d). "The claimant
23 shall have the burden of proving that the claimant is an innocent owner by a preponderance of
24 the evidence." 18 U.S.C. § 983; *United States v. Real Prop. in Santa Paula, Cal.*, 763 F. Supp.
25 2d 1175, 1185 (C.D. Cal. 2011).

26 (2)(A) With respect to a property interest in existence at the time the illegal
27 conduct giving rise to forfeiture took place, the term "innocent owner"
28 means an owner who--

>       (i) did not know of the conduct giving rise to forfeiture; or
>
>       (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

18 U.S.C. § 983(d). The standard differs if the "innocent owner" acquires an interest in the property after the illegal conduct has taken place.

>       (3)(A) With respect to a property interest acquired after the conduct giving rise to the forfeiture has taken place, the term "innocent owner" means a person who, at the time that person acquired the interest in the property--
>
>       (i) was a bona fide purchaser or seller for value (including a purchaser or seller of goods or services for value); and
>
>       (ii) did not know and was reasonably without cause to believe that the property was subject to forfeiture.

18 U.S.C. § 983(d).

An owner, for the purposes of the innocent owner defense, is defined as "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest" but does not include "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983 (d)(6)(A).

NextGear has been providing flooring financing to Remate since 2005. Claimant has established that it had a perfected security interest in all of Remate's inventory and assets, including after-acquired collateral, and therefore was an "owner" of those assets under California law. Cal. Comm. Code § 9204; *Butner v U.S.*, 440 U.S. 48, 55 (1979) (property interests defined by state law). According to the terms of the security agreement, NextGear acquired an interest in the Vehicle when, if ever, it became an "asset" of Remate.

The conduct giving rise to the forfeiture of the Vehicle occurred on June 1, 2011, the date of the structured transaction. By definition, this act must have taken place *prior* to NextGear acquiring an interest in the Vehicle. The conduct giving rise to the forfeiture also

gave rise to the acquisition of the Vehicle, therefore, the structured transaction must have occurred prior to Remate acquiring an interest in the property. Claimant did not have an interest in the property prior to the illegal conduct. Therefore, Claimant must show it (i) was a bona fide purchaser or seller for value (including a purchaser or seller of goods or services for value); and (ii) did not know and was reasonably without cause to believe that the property was subject to forfeiture. 18 U.S.C. § 983(d)(3)(A).

First, the Court must determine when, if ever, claimant acquired an interest in the Vehicle.

Plaintiff argues that because Remate was clearly a nominal owner of the Vehicle, having never exercised dominion, possession, or control over the vehicle, NextGear could never have acquired an ownership interest, because its interest was derivative of Remate's. However, Remate is not claiming to be an "innocent owner" or an "owner" of the property for the purposes of the forfeiture statute. Therefore, the heightened standing requirement in a civil forfeiture action is not applicable. *See United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft*, 659 F. Supp. 2d 1260, 1267 (S.D. Fla. 2009) *aff'd sub nom. United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118*, 619 F.3d 1275 (11th Cir. 2010) (citing cases) (only the party asserting the innocent owner defense needs to meet the heightened standard for ownership under CAFRA).

"The rationale for the rule that bare legal title may be insufficient is that appearances may be manipulated and deceptive, especially in the world of drug trafficking and other illegal operations. It has been recognized that people engaged in illegal activities, especially when needing to conceal illegitimate funds and being aware of forfeiture statutes, often attempt to disguise their interests in property by not placing title in their own names." *United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807 (auto.)*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990). This logic does not extend to a secured creditor asserting an interest in the forfeited property. Contrary to Plaintiff's position, Remate's ownership for the purposes of the security interest attaching is properly determined by state law.

1  NextGear claims its security interest had attached to the Vehicle when the Vehicle was
2  purchased in Remate's name.

3  Attachment occurs when each of three events has taken place: (1) the
4  secured party has possession of the collateral pursuant to an agreement, or
5  the debtor has signed a security agreement describing the collateral, (2) the
6  secured party has given value, and (3) the debtor has rights in the collateral

7  *Bank of the W. v. Commercial Credit Fin. Servs., Inc.*, 852 F.2d 1162, 1166 (9th Cir. 1988)
8  (citing Cal. Com. Code § 9203(1)).

9  The first two prongs are met: Remate had signed a security agreement describing the
10 collateral and NextGear gave value in the form of the flooring line.

11 But a security interest cannot attach unless "the debtor had rights in the collateral." Cal.
12 Com. Code § 9203(1)(c). The determinative question is therefore whether Remate had an
13 interest in the car, such that the security agreement signed by NextGear and Remate covered the
14 forfeited vehicle as an asset in which Remate had an interest.[1]

15 Claimant rests its argument on two facts. First, that LNB executed the Vehicle wholesale
16 report on June 2, 2011, listing Remate as the purchaser of the Vehicle. Second, that NextGear
17 currently possesses the Certificate of Title made out in Remate's name, issued on February 4,
18 2012.

19 Under California's vehicle code
20 An "owner" is a person having all the incidents of ownership, including the
21 legal title of a vehicle whether or not such person lends, rents, or creates a
22 security interest in the vehicle; the person entitled to the possession of a
23 vehicle as the purchaser under a security agreement; or the State, or any
24 county, city, district, or political subdivision of the State, or the United
25 States, when entitled to the possession and use of a vehicle under a lease,

---

[1] The security agreement covered all of Remate's assets. According to Black's Law Dictionary, an asset is "[a]n item that is owned and has value." ASSET, Black's Law Dictionary (10th ed. 2014).

-11-

      lease-sale, or rental-purchase agreement for a period of 30 consecutive days
      or more.

Cal. Veh. Code § 460. Thus, holding title is simply one incident of ownership under state law. *Savnik v. Hall*, 74 Cal. App. 4th 733, 740 (1999) ("An 'owner' is one who exercises the incidents of ownership—dominion, control, right, interest, and title.").

  California Vehicle Code § 5600 defines when the transfer of title or an interest in a car is effective. The default rule in California under § 5600 is that no interest transfers to the transferee until the transferee "makes application for a transfer of registration." California Vehicle Code § 5906, however, exempts transferee-*dealers* from this requirement. "A dealer, unlike other buyers, does not have to register the transfer of a vehicle it acquires for resale; a dealer can wait until the resale before reporting the transfer to the DMV." *Springmeyer v. Ford Motor Co.*, 60 Cal. App. 4th 1541, 1570 (1998); *see also Louis & Diederich, Inc. v. Cambridge European Imports, Inc.*, 189 Cal. App. 3d 1574, 1586 (1987) (holding that an automotive dealer "was not required to make any DMV filing until it transferred ownership to another. In the interim [the transferee dealer] owned the car.").

  California Vehicle Code § 5906 provides that "When the transferee of a vehicle is a dealer who holds the same for resale and operates or moves the same upon the highways under special plates, the dealer is not required to make application for transfer, but upon transferring his title or interest to another person he shall comply with this division." Cal. Veh. Code § 5906.

  The Vehicle Code does not specifically address when the transferee of a vehicle is a dealer who is *not* holding the vehicle for resale, but instead is using a dealer's license fraudulently in order to avoid sales taxes and purchase a vehicle for personal use. By the text of the statute, such a "transferee" would not be "holding [the vehicle] for resale," and thus, would not fall under the § 5906 carve out. Therefore, the purchaser would presumptively have to register the vehicle pursuant to § 5600.

  Although the car was not registered in Remate's name until February 4, 2012, California courts have rejected a literal application of § 5600 as a means to invalidate a sale between a

-12-

buyer and a seller. *Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing,* 119 Cal. App. 4th 1038, 1064–65, 15 Cal.Rptr.3d 70 (2004)) (holding that regardless of registration of the title, the transaction was not void because the buyer dealer purchased a vehicle in the ordinary course of business from the registered owner). The Court therefore needs to look at the incidents of ownership of the vehicle.

"[A]lthough DMV title documents are prima facie evidence of ownership, they are not unimpeachable or conclusive evidence of ownership." *Suburban Motors, Inc. v. State Farm Mut. Auto. Ins. Co.,* 218 Cal. App. 3d 1354, 1363 n.4 (1990). "Vehicle ownership is a fact question [ ] to [be] determine[d] in light of all the circumstances." *In re Stinson*, 443 B.R. 438, 443 (B.A.P. 9th Cir. 2010) (citing *Kaley v. Catalina Yachts,* 187 Cal. App. 3d 1187 (1986)).

Remate had very few incidents of ownership. Although Remate's name appeared on the Vehicle wholesale report, there is no evidence that Remate was an owner of the Vehicle, at least until February 2012 when title was transferred and Mariscal physically obtained the Certificate of Title for the Vehicle. The Vehicle was clearly not purchased in the ordinary course of business. It was never held or possessed for retail sale by Remate. It was never on the lot. The Vehicle was not delivered to Remate. All evidence indicates that it was purchased by Eduardo Escobedo (through Perez), using Remate's dealer's license to avoid sales taxes. There is no indication that, prior to February 2012, Remate had any control over the vehicle. Again, the only indicia of "ownership" is that LNB filled out the DMV wholesale report in Remate's name. NextGear's security interest extended to all of Remate's "assets" including "Inventory" and "Equipment." The Vehicle was not part of Remate's equipment or inventory. Moreover, under California law and the facts of this case, Remate was not an owner of the Vehicle such that the security interest could attach pursuant to the terms of the security agreement.

NextGear's arguments regarding the protection of innocent creditors are not persuasive here. NextGear was a creditor of Remate's business (and presumably it did not finance Remate's role in facilitating Escobedo's joy-riding by allowing the purported drug-dealer to conceal ownership in expensive vehicles and avoid sales taxes). Escobedo's purchases of vehicles for personal use was not a part of the corpus of Remate's legitimate business – used

car dealing – to which NextGear extended credit. Allowing a secured business creditor to reach out and claim assets as collateral that were never part of a business, but were only placed in the nominal title of the business, would perversely encourage creditors to lend to "front" businesses, feeling secure that in the event of insolvency they could claim not only business assets, but all proceeds derived in the "name" of the business – whether or not actually owned by or used as part of the business. NextGear has provided no support logically or in the case law for such an outcome.

NextGear's final argument is that Mariscal picked up the title of the Vehicle when winding up the affairs of the business, and passed that title to NextGear's employee, Troy Rogers in February 2012, establishing that Remate had title to the Vehicle which it passed to NextGear. This transaction took place after the vehicle had been impounded. NextGear has not shown that, at this point in time, it was without cause to believe that the Vehicle was subject to forfeiture. 18 U.S.C. § 983(d)(3)(A). The Vehicle had already been impounded at that point, a fact that Mariscal knew when she retrieved the title and that Troy Rogers knew when Mariscal gave the Certificate of Title to him. Therefore, NextGear cannot establish the elements of the innocent owner defense as a result of holding title to the Vehicle.

NextGear has not proven by a preponderance of the evidence that it was an innocent owner of the Vehicle.

```
```

### IV. Disposition

Plaintiff has met its burden in proving by a preponderance of the evidence that the Vehicle was property traceable to one of more violations of 31 U.S.C. § 5324, and is forfeitable under 31 U.S.C. § 5317(c)(2). NextGear has not met its burden in proving that it was an innocent owner of the Vehicle under 18 U.S.C. § 983(d). Plaintiff is entitled to a judgment of forfeiture.

The Government shall submit a proposed judgment consistent with this Order by **June 22, 2015**.

DATED: June 16, 2015

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

### IV. Disposition

Plaintiff has met its burden in proving by a preponderance of the evidence that the Vehicle was property traceable to one of more violations of 31 U.S.C. § 5324, and is forfeitable under 31 U.S.C. § 5317(c)(2). NextGear has not met its burden in proving that it was an innocent owner of the Vehicle under 18 U.S.C. § 983(d). Plaintiff is entitled to a judgment of forfeiture.

The Government shall submit a proposed judgment consistent with this Order by **June 22, 2015**.

DATED: June 16, 2015

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE