1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

3       **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5  UNITED STATES OF AMERICA,              )
                                           )
6                    Plaintiff,            )    <u>**CERTIFIED**</u>
                                           )
7          vs.                             )    Case No.
                                           )    8:13-cv-00907-DOC-JPR
8  ONE 2006 LAMBORGHINI MURCIELAGO,       )
                                           )    ITEM NO. 30, VOLUME I
9                    Defendant.            )
   _____)
10

11

12

13                 REPORTER'S TRANSCRIPT OF

14                     COURT TRIAL

15                TUESDAY, MAY 26, 2015

16                     9:55 A.M.

17                 SANTA ANA, CALIFORNIA

18

19

20

21

22  _____

23            **DEBBIE HINO–SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
24          411 WEST FOURTH STREET, ROOM 1-191
              SANTA ANA, CALIFORNIA 92701-4516
25                 dhinospaan@yahoo.com


                    **UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4            EILEEN M. DECKER
             United States Attorney
5            BY:  CHRISTEN SPROULE
                  LUCAS E. ROWE
6                 Assistant United States Attorney
             United States Courthouse
7            411 West Fourth Street
             Suite 8000
8            Santa Ana, California 92701
             (714) 338-3505
9
     **FOR THE DEFENDANT:**
10
             PRENOVOST NORMANDIN BERGH & DAWE
11           BY:  PAULA M. HARRELSON, Attorney at Law
                  TOM R. NORMANDIN, ESQ.
12           2122 North Broadway
             Suite 200
13           Santa Ana, California 92706-2614
             (714) 547-2444
14
     **ALSO PRESENT:**
15
             WANDA CHAVEZ
16           Special Agent Homeland Security Investigations

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                           **I N D E X**

2    **WITNESSES**                                              **PAGE**

3    **WANDA CHAVEZ, CALLED BY THE PLAINTIFF**
          Direct Examination by Ms. Sproule              23
4         Cross-Examination by Mr. Normandin             36
          Redirect Examination by Ms. Sproule            48
5         Recross-Examination by Mr. Normandin           50

6    **TROY ROGERS, CALLED BY THE DEFENDANT**
          Direct Examination by Mr. Normandin            53

7

8

9

10

11                          **EXHIBITS**

12                                                    **WITHDRAWN**
                                            **IN**        **OR**
13   **EXHIBIT**                         **EVIDENCE**  **REJECTED**

14     3 - IRS Form 8300                                 25

15     2 - U.S. Bank records                             30

16     4 - Seizure warrant                               34

17     1 - Photos                                        36

18   1-C - Photo                                         37

19   102 - DSC Floor plan                                58

20   103 - DSC Floor plan                                60

21   106 - Demand Promissory Note                        60

22   115 - UCC Financing Statement                       61

23   116 - UCC Financing Statement                       61

24   108 - Receivable Detail Report                      63

25

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; TUESDAY, MAY 26, 2015** |
| 2 | **9:55 A.M.** |
| 3 | **- - -** |
| 4 | THE COURT:  We'll start with the appearance by the |
| 09:55AM 5 | government, please. |
| 6 | MS. SPROULE:  Christen Sproule for the |
| 7 | United States.  With me at counsel table is Lucas Rowe.  Also |
| 8 | Special Agent Wanda Chavez of Homeland Security Investigations. |
| 9 | THE COURT:  All right.  Welcome.  Thank you. |
| 09:55AM 10 | Counsel. |
| 11 | MR. NORMANDIN:  Good morning, Your Honor.  My name |
| 12 | is Tom Normandin.  With me is my senior associate, Paula |
| 13 | Harrelson. |
| 14 | THE COURT:  Pleasure.  I think I met you last time, |
| 09:55AM 15 | Ms. Harrelson.  If you'd be seated. |
| 16 | This is a forfeiture case.  And on June 14, 2013, the |
| 17 | government filed this action against One 2006 Lamborghini, |
| 18 | which is the vehicle seized from Eduardo Escobedo on |
| 19 | January 15, 2012, in Los Angeles. |
| 09:56AM 20 | And Counsel, bear with me.  I just want to set this record |
| 21 | for appellate purposes. |
| 22 | Around June 1st, 2011, a series of cash deposits just |
| 23 | under $10,000 each were deposited in connection with the |
| 24 | purchase of the car.  The government determined that the |
| 09:56AM 25 | pattern of deposits was indicative of structuring in order to |

1   evade transaction reporting requirements in violation of

2   31 U.S.C. 5324, leading to the eventual seizure of the vehicle.

3       NextGear they filed an answer to the civil forfeiture

4   Complaint on July 29, 2013.  In the answer, it did not

09:56AM 5   affirmatively plead the innocent owner defense under 18 U.S.C.,

6   Section 983(d); however, NextGear asserts that it is the

7   secured creditor of the used car dealership, Remate del Monte,

8   with a priority interest in Remate's assets, including the

9   vehicle and, therefore, is an innocent owner for the purposes

09:57AM 10  of Subsection (d).

11      In addition, NextGear asserts that the government will be

12  unable to prove by the preponderance of the evidence that the

13  vehicle was subject to forfeiture.  The government maintains

14  that NextGear never obtained an interest in the property

09:57AM 15  because Remate never obtained an interest.  It notes the title

16  to the vehicle was not issued in Remate's name until February

17  2012 after the vehicle had been impounded.

18      Now you're here for trial purposes today.  Let me try to

19  retrace my memory of what occurred.  And I could be off in

09:57AM 20  dates and times, Counsel.  It's been represented to this Court

21  for -- on prior occasions that there was in all likelihood a

22  settlement in this matter.  And I advanced the case to May 4

23  because I didn't want you keeping late evening hours frankly.

24  We're a busy court.  And I had a hole, if you will, and then

09:58AM 25  I -- in my calendar, and I thought it was a good time to try

1    the case during normal hours.  But around that period of time I

2    became concerned because there was discussion -- I think,

3    Counsel, you were here.  I don't think your other counsel was

4    here.  And I was astounded at that time to learn that there had

09:58AM  5    been an offer or some kind of acceptance and some kind of

6    rejection.

7         In other words, it appeared to the Court, either in April

8    or May or something, that there was still negotiation going on.

9    And although I wasn't privy to it, I formed the impression, and

09:58AM 10    it could be the wrong impression, that there was still the

11    negotiation going on.  And yet I had been hearing there was a

12    settlement that the Court shouldn't be concerned with this

13    case.  That caught me flatfooted quite frankly.

14         Then I got a motion from one of counsel, and I think it

09:58AM 15    was you, Counsel, that you had some matter, and I didn't want

16    to disturb a personal obligation.  We can be tough in court,

17    et cetera, but when you got family, vacations, I try to have my

18    counsel keep those.  So I reverted from my May 4th date to

19    May 26.

09:59AM 20         If, in fact, you had reached a settlement, I would have

21    given the U.S. Attorney's Office time, quite frankly, to go

22    through your formal procedure.  But what I'm astounded at is

23    getting the representation that, "Oh, Judge, it's going to

24    settle."

09:59AM 25         And then I'm hearing -- and I don't know if it came to me

in the papers or the conversations with both counsel on the
last occasion that there had been an acceptance or an offer and
rejected by the government.  That's everything contrary to what
I heard since 2013.  I was always assured the case was going to
09:59AM settle.  So that's why you're here.  And I apologize for the
late hours tonight, but it's litigation time.

     The government filed two motions in limine.  The motion in
limine No. 1, in this first motion in limine the government
seeks to foreclose plaintiff from raising the innocent owner
10:00AM defense because it was not pleaded specifically in the answer.
And the innocent owner defense in a forfeiture action is an
affirmative defense that must be pleaded in the answer.

     I have trouble with this motion.  The defense certainly
was not pleaded in the answer.  The claimant has demonstrated
10:00AM good cause for modification though of the scheduling order
under Rule 16(b) to modify its answer and plead the affirmative
defense.  It seems to this Court that the government has been
aware of Nextgear's innocent owner position throughout this
litigation.

     Given the fact that the parties have represented to the
Court that they were close to settlement on numerous occasions
and led the Court to believe this, that the government -- the
government would have no reason to settle if it did not believe
that NextGear had some legally tenable defense, it's hard to
10:00AM fathom for me how the government's prejudiced here, who has

1  been fully aware of Nextgear's position throughout the

2  litigation.  Any failures to depose witnesses or file

3  dispositive motions is more likely the result of the belief

4  that the case was going to settle, that a strategic decision

10:01AM 5  due to lack of notice of the government.

6      I know the government's now seeking additional discovery

7  in light of the pending trial and an opportunity to now file

8  dispositive motions given the fact that they did not do so

9  sooner in light of the impending settlement.  I have considered

10:01AM 10  whether to continue the trial -- I'm not going to -- and to

11  place responsibility on both of you frankly.  And I don't mean

12  you personally, Counsel.  You're not counsel of record, and I'm

13  not besmirching prior counsel, but you can't come into court

14  saying, "We're going to settle the matter.  Give us more time"

10:01AM 15  with this number of continuances and then claim that you're

16  biased or prejudiced against.  So your motion is denied,

17  Counsel.

18      The next thing is the internal decision-making process.

19  By advancing the matter to May 4, I tried to think, is this

10:01AM 20  fair?  Driving home tonight, is this fair?  We have to ask

21  ourselves that, I think, as a court.  And if, in fact, there

22  were negotiations, you've had a year or more to do that,

23  actually two years.

24      And I state, once again, I was caught flatfooted with the

10:02AM 25  fact that there had been a rejection by the government and that

**UNITED STATES DISTRICT COURT**

1    could be a good-faith rejection.  But all of this discussion

2    about having settled, "Judge, it's going to settle," goes by

3    the wayside.

4         Lastly, I've considered whether you're prejudiced

10:02AM  5    individually as counsel coming on the case.  I'm concerned

6    about that.  But if, in fact, the settlement was reached, you

7    could have reached it May 4th, May 5th, May 6th.  You could

8    have informed the Court in good faith.  If you both said that

9    to the Court, I'd give you the time.  In other words, I'd send

10:02AM 10    you right back.  I wouldn't make you go to trial today.  I'd

11    send you back not to renegotiate, but if I had something

12    concrete in my hands, I'm not going to prejudice you or the

13    defense from reaching some settlement that you both agreed to

14    in good faith in controlling your own future, but I'm not going

10:02AM 15    to sit here now and listen to the fact that, "Judge, we haven't

16    even settled it.  We're not even in the ballpark.  We haven't

17    even started the process."  So we're going forward.

18         Counsel, your opening statement, please.

19              MR. NORMANDIN:  Your Honor, I'm sorry to interrupt,

10:03AM 20    but --

21              THE COURT:  Don't, then.  And all witnesses in this

22    matter is excluded.  If you're going to testify, you remain in

23    the hallway.

24              MR. NORMANDIN:  Including the representative from

10:03AM 25    the client who will be testifying?  Troy Rogers will be

```
  1    testifying on behalf of NextGear.
  2             THE COURT:  Well, why is he present?  In other
  3    words, I'm less inclined to believe his testimony, quite
  4    frankly, if it's substantive, because he's sitting here
10:03AM  5    listening to the testimony.  I'll allow him to stay.  But if
  6    you're asking me if he can stay, yes.  I think that's a
  7    detriment to you frankly.
  8             MR. NORMANDIN:  Thank you, Your Honor.
  9             MS. SPROULE:  Your Honor, the government has the
10:04AM 10    case agent at our table as well.
 11             THE COURT:  If that person is to testify, she can
 12    remain.  But I'm saying if there's a substantive issue, then
 13    the Court has to take into account what that person has heard.
 14    I'm not so naive to believe that everybody hasn't spoken about
10:04AM 15    the case, but if he's remaining, I don't see why the other
 16    gentleman is not remaining, and it could balance out.
 17             MS. SPROULE:  Your Honor, we've asked our case agent
 18    to step out.
 19             THE COURT:  You both talk to your clients.
10:04AM 20             MS. SPROULE:  May it please the Court, Counsel, this
 21    case is simple.  First, the vehicle at issue was purchased with
 22    obviously structured funds subjecting it to forfeiture by the
 23    United States.  And second, the car dealership that the
 24    claimant had a loan agreement with was never an owner of this
10:04AM 25    vehicle.  So claimant's security interest never attached the
```

```
 1    vehicle.  Because neither claimant nor its customer car

 2    dealership was ever an owner of the car, the innocent owner

 3    defense fails.  In the end, the Court will find the evidence

 4    overwhelming and will find the vehicle should be forfeited to

 5    the government.

 6         In terms of procedure, this trial will be divided into two

 7    parts --

 8              THE COURT:  By the way, we'll finish tonight, just

 9    so you know.  So get all your witnesses from both sides in

10    here.  If it's midnight, so be it.

11              MS. SPROULE:  First, the government will prove by a

12    preponderance of the evidence that the vehicle at issue, a 2006

13    Lamborghini Murcielago, is forfeitable.  Then the burden shifts

14    to the claimant to prove the innocent owner defense set forth

15    in 18 U.S.C. 983(d) applies.

16         In terms of forfeiture, first during its case which,

17    Your Honor, the government estimates will take approximately

18    ten minutes to do the direct of our case agent and some of our

19    forfeiture case --

20              THE COURT:  You have unlimited time.  You can take

21    an hour if you want to.  I'm just joking with both counsel.  I

22    always enjoy my attorneys here.

23              MS. SPROULE:  We do believe our case is very simple,

24    and we can present it very quickly.

25         The government will prove by a preponderance of the
```

**UNITED STATES DISTRICT COURT**

1    evidence that the vehicle at issue, a 2006 Lamborghini

2    Murcielago, is forfeitable.  To do that, the government will

3    prove three things as required by 31 U.S.C., Section 5313 and

4    5324.  First, that the person who deposited the funds or caused

10:06AM 5    them to be deposited knowingly structured a cash transaction.

6         Second, that the person who deposited the funds knew of

7    the bank's legal obligation to report cash transactions in

8    excess of $10,000.

9         And third, the person who deposited the funds acted with

10:06AM 10   the intent to evade the supporting requirement.

11        In this case, the structuring knowledge and intent are

12   obvious.  The evidence will show that on June 1st, 2011, 17

13   separate cash deposits totaling $164,200 were deposited into a

14   U.S. bank account owned by Lamborghini of Newport Beach to pay

10:07AM 15   for the 2006 Lamborghini.  These 17 deposits were conducted at

16   16 different U.S. Bank branches throughout Southern California,

17   between 10:07 a.m. and 4:56 p.m.  Each of the 17 cash deposits

18   was for an amount between $9400 and $9800.

19        Your Honor, there is no --

10:07AM 20        THE COURT:  I'm sorry, the total amount, again, was

21   174,000?

22        MS. SPROULE:  164,000.

23        THE COURT:  Thank you.

24        MS. SPROULE:  Your Honor, there is simply no

10:07AM 25   reasonable explanation for this pattern of deposits other than

```
    1   someone's knowledge of the reporting requirements and his

    2   intent to evade them.  In fact, many courts have considered

    3   very similar patterns of deposits and found that the number and

    4   pattern of transactions is sufficient to determine that a

10:07AM 5   violator acted with the knowledge of the reporting requirements

    6   and the intent to evade them.

    7        For example, in United States vs. MacPherson, which is

    8   424 F.3d 183, Second Circuit, 2005, the Second Circuit affirmed

    9   the district court's finding that structuring occurred where a

10:08AM 10  criminal defendant was willing to sacrifice efficiency by

   11   depositing a quarter-million dollars through multiple small

   12   transactions structured to ensure that no one deposit exceeded

   13   $10,000.

   14        The Court found that the number and patterns of

10:08AM 15  transactions, quote, "amply supported a reasonable inference

   16   that he knew of and was intent on evading and reporting

   17   requirements."

   18        Your Honor, this same finding has been made by countless

   19   circuits including the Ninth Circuit in the United States v.

10:08AM 20  Pang, 362 F.3d 1187.

   21             THE COURT:  United States --

   22             MS. SPROULE:  -- v. Pang, P-a-n-g.

   23        And, Your Honor, all these cases that I cite are present

   24   in our contentions of law as well.

10:08AM 25             THE COURT:  Right.
```

**UNITED STATES DISTRICT COURT**

1          MS. SPROULE:  And that cite is 362 F.3d 1187,

2    Ninth Circuit, 2004.

3          And, in fact, as I said, the government said in numerous

4    cases in its papers where circuit courts reached the same

10:09AM  5    conclusion, that simply based on the pattern of transactions,

6    the circumstantial evidence is sufficient to find that

7    structuring occurred.  Those cases are *United States vs. Allen*,

8    524 F.3d, 814, Seventh Circuit, 2008, and *United States vs.*

9    *Peterson*, a recent case in the Fourth Circuit, 2010, 607 F.3d

10:09AM 10    975.

11          The evidence here will show that the funds from the 17

12    structured cash deposits made into Lamborghini of

13    Newport Beach's bank account at U.S. Bank were used exclusively

14    to purchase the Defendant Lamborghini.  So the defendant assets

10:09AM 15    is traceable to violations of 31 U.S.C. 5324, which is the

16    structuring statute, and is subject to forfeiture pursuant to

17    31 U.S.C., Section 5317.

18          Now once the government establishes forfeitability, the

19    claimant may attempt to present evidence of the affirmative

10:10AM 20    defense of innocent ownership.  As defined by 18 U.S.C. 983(d),

21    claimant maintains that it housed security interest in an

22    inventory of a used car dealership called Remate del Monte.  So

23    claimant's ownership interest in the defendant vehicle is

24    derivative of Remate.  That is, if Remate never owned the

10:10AM 25    defendant vehicle, then claimant's security interest never

1   reached that vehicle.  Because under federal law the vehicle

2   was never in the possession, dominion or control of Remate.

3   Remate never owned it and neither did claimant.

4        To establish the defense of innocent ownership, a claimant

10:10AM 5   must first establish that it was an owner of a federal

6   property.  "Owner" is defined in 18 U.S.C. 983(d).  And

7   pursuant to the statute specifically excludes a, quote,

8   "Nominee who exercises no dominion or control over the

9   property."  Countless courts have found that where a claimant

10:11AM 10  exercises no such dominion or control over a vehicle, that

11  claimant is merely a nominee or straw buyer and is not a true

12  owner as defined by federal law.

13       One such example is in the Eighth Circuit, *United States*

14  *vs. One Lincoln Navigator 1998*.  That's 328 F.3d 1011, Eighth

10:11AM 15  Circuit, 2003.  In that case the Eighth Circuit found that

16  state law regarding ownership is overridden by the federal

17  definition of an owner as defined in Section 983(d).  The

18  Court -- the Eighth Circuit found where the claimant is a

19  nominee who exercises no dominion or control over the property,

10:11AM 20  that claimant is not a true owner under federal law and cannot

21  be an innocent owner.

22       Similarly here, the evidence will show that the used car

23  dealership Remate was never an owner of the defendant vehicle.

24  No funds under the control of Remate were used to pay in whole

10:12AM 25  or part for the defendant vehicle.  No employee or authorized

representative of Remate purchased the defendant asset from
Lamborghini of Newport Beach or any other party.

At no time was the defendant vehicle held in Remate's
inventory for sale.  At no time was the defendant vehicle
actually financed by the claimant.  Thus, the evidence will
show that Remate was at best a nominee, because someone used
its dealership documents to avoid paying significant sales tax
and registration fees and to hide the true identity of the true
owner of the car.

So the evidence will show that claimant's security
agreement never reached the defendant asset because the
defendant asset was never in the inventory of Remate, and thus,
claimant has no ownership interest in this vehicle.

Moreover, at the time that Cecilia Mariscal obtained the
title for the defendant vehicle on February 4th, 2012, all
relevant parties knew or should have known that the vehicle was
subject to forfeiture because it had already been seized by the
United States pursuant to a seizure warrant.

Under section 983(d)(3), a claimant cannot be an innocent
owner if it knew or, quote, "reasonably should have known" that
the property was subject to forfeiture.

Because the vehicle at that point was already in the
custody of the federal government, all parties were on notice
the car was subject to seizure, and the innocent owner defense
cannot apply.

```
         1          Your Honor, at the end of this case, you'll find this case
         2     is simple because there is no reasonable explanation for the
         3     pattern and number of cash deposits other than the knowledge
         4     and intent to avoid the bank's reporting requirements.  The
10:13AM  5     funds used to purchase the vehicle were illegally structured.
         6     So the car is subject to forfeiture to the United States.
         7          Second, because Remate never owned the defendant vehicle,
         8     claimant security interests never reached it.  So claimant's
         9     innocent owner defense fails.
10:14AM 10          In the end, once all evidence is submitted, the Court will
        11     return the only reasonable verdict in this case, a finding of
        12     forfeiture for the United States.  Thank you, Your Honor.
        13               THE COURT:  Thank you very much, Counsel.
        14          Counsel, would you like to make your opening statement or
10:14AM 15     reserve that until the beginning of your case?
        16               MR. NORMANDIN:  I'll go ahead and make the opening
        17     statement here now.
        18               THE COURT:  Mr. Martinez, I believe your counsel is
        19     on the way.
10:14AM 20               MR. NORMANDIN:  May it please the Court, we're here
        21     representing NextGear Capital, Inc., and our representative,
        22     Troy Rogers, is out in the hallway.  Mr. Rogers will testify,
        23     and you will learn that he does know his customer Remate.  The
        24     context in which this Court must make its decision is in the
10:14AM 25     context that forfeitures are not favored.
```

1          Forfeitures should not occur unless both the spirit and

2    the law are strictly complied with and fully satisfied.  The

3    only victim here is NextGear, my client.  They are a secured

4    creditor of Remate.  No reasonable argument to the contrary can

10:15AM  5    be made.

6          NextGear is the only victim who has lost money here.

7    Lamborghini of Newport Beach, they have the $160,000 deposited

8    in June of 2011.  Remate has the money it borrowed from my

9    client, NextGear.  Escobedo, this gentleman is somewhat of a

10:15AM 10    criminal.  We don't know who he is.  He won't be testifying,

11    but he does not deserve anything from this Court.  Zugasti is

12    in -- waiting to be deported.  He was the owner or part owner

13    of --

14          MS. SPROULE:  Objection, Your Honor.  This is not

10:15AM 15    coming into evidence.

16          THE COURT:  Overruled.

17          MR. NORMANDIN:  And Cecilia Mariscal, who used to be

18    married to Mr. Zugasti and who used to be an owner of the

19    Remate dealership, she hasn't suffered any loss either.  She's

10:16AM 20    working now as a salesperson, and she will testify.

21          NextGear is owed over $233,000, and we have the written

22    evidence to support that.  NextGear itself, Your Honor, is a

23    sister company of Cox Communications.  You will recognize Cox

24    Cable as one of its subsidiaries.  They also own

10:16AM 25    AutoTrader.com.  They own Kelley Blue Book.  They own Manheim

Auto, the largest auction company in the world.  We are

legitimate licensed lenders to auto dealers.  We provide

flooring.  And we have done everything right since 2005.

     The evidence will show that NextGear first entered into a

business relationship with Remate in 2005.  It documented that

relation in the form of a promissory note.  It recorded a UCC

with the California Secretary of State's office.  It did

everything right.

     As part of that business relationship, Remate agreed to

give NextGear after-acquired collateral.  What that means is

that anything that came into the possession, any asset of

Remate automatically became collateral to NextGear.  NextGear

didn't have to do anything.  California Commercial Code, which

controls here 9204, allows a debtor such as Remate

after-acquired collateral.  And that is what we're talking

about here, a Lamborghini which is after-acquired collateral.

     NextGear's interest attached to that Lamborghini on

June 2nd, 2011, pursuant to California Commercial Code 9203.

Why is that?  Because three things were met:  One, Remate had

given NextGear a security agreement, a written security

agreement.  NextGear had perfected that security agreement by

recording with the Secretary of State's office.  Remate gave

Lamborghini Newport Beach money, $164,000.  And then Remate

received something of value, the vehicle.

     Remate put its own dealer plates on the vehicle.  In other

words, you'll see in the Government's Exhibit 1 a photograph of
the plates that were attached to the subject vehicle.  And it
shows the dealer number, which we will tie to Remate's dealer
number.

10:18AM   Remate could have sold that vehicle at any time,
Your Honor.  At any time.  It was registered -- they held the
pink slip.  They had the right to sell it.  They were a dealer.
It was a transaction from a dealer, Lamborghini of Newport
Beach to a dealer, Remate.  And Remate could have sold that.
10:19AM And anyone purchasing from Remate would be a BFP, a bona fide
purchaser.  Neither NextGear, my client, nor Lamborghini
Newport Beach, nor anyone else could challenge that BFP,
because that -- so long as that BFP was a BFP.  The importance
there is Remate had the ability to transfer title at any time
10:19AM before seizure.

I'm holding in my hand, Your Honor, an original
certificate of title often called a pink slip.  This was --
this is prima facie case that the holder of this pink slip is
the owner of the vehicle.  We received this from Remate.
10:19AM NextGear received it from Remate.  We established a prima facie
case of an innocent owner defense under 18 U.S.C. 983(d).

The Government's case is built on suspicions, Your Honor.
They can't prove that this was drug money.  They can't prove
this was not Remate money.

10:20AM   Mr. Escobedo, whose name will come up in this case,

1    arguably or apparently was a -- the one who went and purchased

2    it from Lamborghini.  Mr. Escobedo is a partner in Ramate.

3    That's what the evidence will show.  He's a partner.  He gave

4    Ramate money.  He was a financier.  He was a flooring company.

10:20AM  5    He sold cars, he delivered cars to Ramate on a regular basis.

6    In other words, when Mr. Escobedo -- if he was the one who

7    purchased the vehicle from Lamborghini Newport Beach was the

8    agent of Ramate, he put it in Ramate's name.

9         He could not -- Mr. Escobedo could not assert any rights

10:21AM 10   to that vehicle because it wasn't in his name.  He was not the

11   purchaser.  Mr. Escobedo never made claim to this -- in this

12   action in this case.  He never filed anything.  He never went

13   down to the Irwindale Police Department who had impounded the

14   vehicle and made claim there.

10:21AM 15        The only one who made any claim is Mr. Zugasti.  And

16   Mr. Zugasti is the owner of Ramate.  He went first to the

17   Irwindale Police Department.  "That's my vehicle.  I'm Ramate.

18   That's mine."  And he also filed a claim here.  He dismissed

19   the claim for obvious reasons, when a vehicle is worth less

10:21AM 20   than the amount that he owes a secured creditor NextGear.  He

21   had no equity in the vehicle, and he was leaving the country

22   anyway.

23        So all in all, at the end of the day, Your Honor, I think

24   the evidence will be quite strong in our favor.  We will be

10:21AM 25   able to prove that we're an innocent owner under 18 U.S.C.

```
 1    983(d).  Thank you.
 2            THE COURT:  All right.  Let me ask you both one
 3    question before we proceed.  I want to make absolutely certain
 4    that you are not still negotiating, and you both want to
 5    proceed forward.  That's the position I'm taking quite frankly,
 6    because on the last occasion I think you represented that the
 7    government declined whatever your offer was.  Is that the
 8    position we find ourselves in?
 9            MS. SPROULE:  Yes, Your Honor.
10            THE COURT:  Then let's proceed.  Your first witness.
11    I want to do that in good faith.
12            MS. SPROULE:  The government calls Special
13    Agent Wanda Chavez to the stand.
14            THE COURT:  Thank you.
15            MS. SPROULE:  If I may distribute the government
16    books.
17            THE COURT:  Please.  If you would put it over on
18    that table.  I have a habit of walking down and looking at it.
19        WANDA CHAVEZ, PLAINTIFF'S WITNESS, WAS SWORN
20            THE COURT:  Would you be kind enough to be seated in
21    the witness box.  And the entrance is closest to the wall.
22        Would you state your full name for the record, please.
23            THE WITNESS:  Wanda Chavez.
24            THE COURT:  Counsel, you can put the exhibits up on
25    the Elmo as we go.  It's easier for me to look at the witness
```

10:22AM (lines 5, 10, 15)
10:23AM (lines 20, 25)

**UNITED STATES DISTRICT COURT**

```
  1   and see those on the Elmo than it is going through the book.  I
  2   can look through the book tonight.
  3               MS. SPROULE:  Yes.  Is the system on, Your Honor?
  4               THE COURT:  Well, now that's always a mystery.  I'm
  5   not sure.  We'll make sure we get that up on the screen.
  6               MS. SPROULE:  Thank you, Your Honor.  I will
  7   proceed.
  8                       DIRECT EXAMINATION
  9   BY MS. SPROULE:
 10   Q    Agent Chavez, please state your name for the record.
 11   A    Wanda Chavez.
 12   Q    Do you work for a government agency?
 13   A    Yes, I do.
 14   Q    Which one?
 15   A    Department of Homeland Security.
 16   Q    What is your position there?
 17   A    I'm a special agent with Homeland Security Investigations.
 18   Q    How long have you been a special agent with Homeland
 19   Security Investigations?
 20   A    Since the creation of the agency, 2003.
 21   Q    Before that where were you employed?
 22   A    I was with the former Immigration and Naturalization
 23   Service.
 24   Q    What was your position there?
 25   A    Also special agent.
```

UNITED STATES DISTRICT COURT

```
 1    Q     When did you become a special agent at INS?

 2    A     Since September 1997.

 3    Q     Where are you currently assigned at Homeland Security?

 4    A     I work in the asset identification and removal group in

10:24AM 5  Long Beach.

 6    Q     How long have you been with that group?

 7    A     Since October 2010.

 8    Q     What do you do as a special agent and asset

 9    identification and removal?

10:25AM 10  A     We -- our investigations involve identification and

11    seizing assets which are derived from criminal activity --

12    proceeds from criminal activity.

13    Q     What training have you received to perform your duties in

14    this section?

10:25AM 15  A     Formal training, two-week course in Glynco, Georgia, and

16    one-week course in money laundering couple years ago.  And then

17    just ongoing training.

18    Q     Was there a time that you became aware of a 2006

19    Lamborghini Murcielago, VIN No. ZHWBU26796LA02025?

10:25AM 20  A     Yes.

21    Q     And when was that?

22    A     I think it was around October 2011.

23    Q     Did you review an IRS Form 8300 in relation to that

24    Lamborghini?

10:26AM 25  A     Yes, I did.
```

UNITED STATES DISTRICT COURT

```
 1   Q     I'm going to show you what's been marked as Government's
 2   Exhibit 3.  I believe you can see it on that screen in front of
 3   you.
 4   A     No.
 5   Q     Or the screen behind you.
 6   A     Okay.  There it is.
 7   Q     Do you recognize this document?
 8   A     Yes.
 9   Q     And what is it?
10   A     It's an 8300 report of cash payments over $10,000 received
11   in a trade or business.
12   Q     Is this the Form 8300 that you reviewed in this
13   investigation?
14   A     Yes, it is.
15   Q     Where did you get it?
16   A     I received it from USA -- U.S. Bank.
17         MS. SPROULE:  Your Honor, the government moves to
18   admit Government's Exhibit 3.
19         THE COURT:  Received.
20         (Exhibit No. 3 received.)
21   Q     BY MS. SPROULE:  What is a Form 8300?
22   A     It's a report of cash received over $10,000.  It's used by
23   businesses.
24   Q     And on this particular form, who filed it?
25   A     This one here was filed by Lamborghini of Newport Beach.
```

10:26AM (line 5)
10:26AM (line 10)
10:26AM (line 15)
10:26AM (line 20)
10:27AM (line 25)

```
 1   Q    I'm going to zoom in here.  And down here it says

 2   Lamborghini of Newport Beach.  Do you see that?

 3   A    Correct.

 4   Q    Is that how you know who filed the report?

 5   A    Yes.

 6   Q    Okay.  And I'm going to move up on the form.  Here it

 7   says specific description of property.  Do you see that?

 8   A    Yes.

 9   Q    Can you read that into the record.

10   A    "2006 Lamborghini Roadster.  VIN" -- do you want me to

11   read the VIN?

12   Q    Yes, please.

13   A    "ZHWB" --

14   Q    Should I zoom in?

15   A    Yeah.  I didn't bring my glasses.

16        -- "U28S96LA02025."

17   Q    And right above that it says, "Specific description of

18   property or service shown."  What does that mean?

19   A    That is the item that was purchased with the cash over

20   $10,000.

21   Q    I'm going to show you at the top, "Identity of individual

22   from whom the cash is received."  Do you see that?

23   A    Yes.

24   Q    What is entered there?

25   A    Perez, Luis.
```

10:27AM (line 5)
10:27AM (line 10)
10:27AM (line 15)
10:28AM (line 20)
10:28AM (line 25)

**UNITED STATES DISTRICT COURT**

1    Q     And here in Part 2, "Person on his behalf, this

2    transaction was conducted," what does it say?

3    A     "Ramate del Monte."

4    Q     Based upon what you learned from reading this --

10:28AM 5            THE COURT:  I'm sorry, Counsel, what line are you

6    reading from?

7                    MS. SPROULE:  Right here, "Ramate del Monte."

8                    THE COURT:  What box number?

9                    MS. SPROULE:  "Person on" --

10:28AM 10           THE COURT:  Box number.

11                   THE WITNESS:  19.

12                   THE COURT:  Okay.

13                   MS. SPROULE:  Yes.  Part 2.  Thank you.

14   Q     Where did the information -- based on your training and

10:28AM 15   experience, where does the information that's entered on to

16   this form come from?

17   A     It comes from the business who received the money.

18   Q     Okay.  The person who filled out the form; is that right?

19                   THE COURT:  I'm sorry, Counsel, could you slow down

10:29AM 20   just a little bit.  Move that microphone a little closer, also,

21   to the Elmo.  Just put it over by the Elmo so if you're moving

22   back and forth between the Elmo, we have your voice.  Repeat

23   your question.

24   Q     BY MS. SPROULE:  Where does the information on this form

10:29AM 25   come from?

```
 1              MR. NORMANDIN:  Objection.  Lacks foundation.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Who fills it out?  It's an employee

 4    of -- on this case, Lamborghini of Newport Beach.

10:29AM  5    Q    BY MS. SPROULE:  Okay.  Now based upon what you learned

 6    from your review of Form 8300, did you review bank records?

 7    A    Yes, I did.

 8    Q    I'm going to show you what's been marked as Government's

 9    Exhibit 2.  Do you recognize these?

10:30AM 10    A    Yes.

11    Q    Okay.  It's a series of pages; is that right?

12    A    Correct.

13    Q    That you previously reviewed; right?

14    A    Correct.

10:30AM 15    Q    Okay.  What is Exhibit 2?

16    A    This is a cash wire report.

17    Q    Well, in general, what are these pages?

18    A    They're banking documents.

19    Q    Where did you receive those banking documents?

10:30AM 20    A    From U.S. Bank.

21              MS. SPROULE:  Your Honor, we do move to admit

22    Government's Exhibit 2.

23              THE COURT:  Received.

24    Q    BY MS. SPROULE:  Are these banking records for U.S. Bank

10:30AM 25    account ending in 8345?
```

```
 1    A     Yes, they are.

 2    Q     Who owned that bank account?

 3    A     The business account for Lamborghini in Newport Beach.

 4    Q     Is this the account listed in the Form 8300, Exhibit 3?

 5    A     Yes, it is.

 6    Q     This first page, what does it say here at the top?

 7    A     It's a cash wire report.

 8    Q     What's cash wire report?

 9    A     A banking statement listing deposits received into their

10    account.

11              MR. NORMANDIN:  Objection.  Move to strike.  Lacks

12    foundation.

13              THE COURT:  Overruled.

14    Q     BY MS. SPROULE:  I'm moving three pages in.  Do you

15    recognize this?

16    A     Yes.

17    Q     And again, you previously reviewed this exhibit; right?

18    A     Correct.

19    Q     And are there a series of these counterdeposits in the

20    remainder of this exhibit?

21    A     Yes, there is.

22    Q     Okay.  Can you tell us what a counterdeposits is?

23    A     It's a deposit slip that someone can pick up inside a bank

24    branch to make a deposit into a certain account.

25    Q     How many of those counter deposit tickets did you review
```

```
 1    in this case?

 2    A      17.

 3    Q      And why is that?

 4    A      There were 17 cash deposits made into this particular

10:32AM  5    account that particular date.

 6    Q      Okay.  And I'm showing you what has been marked as

 7    Government's Exhibit 2A.  Do you recognize this?

 8    A      Yes.

 9    Q      Is this a summary chart of the bank records that you

10:32AM 10    reviewed in this case?

11    A      Yes, it is.

12    Q      Have you reviewed the information in this chart and

13    compared it with the information in the bank records?

14    A      Yes.

10:32AM 15    Q      Is it accurate?

16    A      Yes, it is.

17              MS. SPROULE:  Your Honor, we move to admit

18    Government's Exhibit 2A.

19              THE COURT:  Received.

10:32AM 20        And you have the supporting documentation?

21              MS. SPROULE:  We do, Your Honor.  That was what I

22    represented in Exhibit 2.

23              THE COURT:  Okay.

24              (Exhibit No. 2 received.)

10:32AM 25    Q      BY MS. SPROULE:  Reading the title here, can you tell me
```

         1    what is contained in this summary chart that is reflected by

         2    the bank records.

         3    A    These are cash deposits made on June 1st, 2011, into the

         4    Lamborghini Newport Beach U.S. Bank, account number ending in

10:33AM  5    8345.

         6    Q    Okay.  Were all these -- so these all reflect cash

         7    deposits made on June 1st, 2011; is that right?

         8    A    Correct.

         9    Q    Made into the same account?

10:33AM 10    A    Correct.

        11    Q    How many separate cash deposits were made?

        12    A    17.

        13    Q    What was the time frame that these bank deposits -- these

        14    cash deposits were made?

10:33AM 15    A    They appear to have started around 10:07 in the morning

        16    until about 4:56 in the afternoon.

        17    Q    And there were 17 different cash deposits.  How many

        18    different bank branches were these deposits made into?

        19    A    Appears like 17.  16 maybe.

10:33AM 20    Q    Is one duplicative here?

        21    A    Oh, maybe 15.

        22    Q    Okay.  What was the total of the cash deposit?

        23    A    The cash deposited totaled 164,200.

        24             THE COURT:  164 --

10:34AM 25             THE WITNESS:  164,200.

THE COURT: Thank you. Just a moment.
Would you go back to Exhibit 3 for a moment.
MS. SPROULE: Yes, Your Honor.
THE COURT: And put it up on the screen. And would you go to the line and blow it up. It's going to show, according to my notes, 184,200, but the actual price, 174,700.
MS. SPROULE: Your Honor, the total cash received is, I believe --
THE COURT: Counsel, just a moment. Thank you very much.
Is that 184 or 164?
MS. SPROULE: I can zoom more. It's 164.
THE COURT: I want to hear from the witness.
THE WITNESS: 164.
THE COURT: 164. I couldn't read that. Looked like 184. Just a moment.
I want Exhibit 3 still up on the Elmo. Thank you. Would you look over at the box -- I can't read this document.
MS. SPROULE: I'll zoom in, Your Honor.
THE COURT: Blow up that line, please. Look at the box with the, I think, 174,700, I think, on it. Stop right there. Now center that on the Elmo. Thank you. All right.
So in reading Exhibit 3, you would surmise 164,208?
THE WITNESS: It's 200.
THE COURT: 200. It's hard to read. 200 is

```
         1    received.  And you have that exact number matching in 2A of

         2    Exhibit -- well, Exhibit 2A; is that correct?

         3              THE WITNESS:  (No audible response.)

         4              THE COURT:  Now look at Box 23.  Let's make it

10:36AM  5    simple.  See 164,200?

         6              THE WITNESS:  Okay.

         7              THE COURT:  Now, I originally thought -- this is why

         8    I was confused, I thought that was 184.  But it's 164,200;

         9    right?

10:36AM 10              THE WITNESS:  Correct.

        11              THE COURT:  Now counsel put up 2A.  On the bottom

        12    number, there's a 164,200; right?

        13              THE WITNESS:  Correct.

        14              THE COURT:  Counsel, my confusion was I couldn't

10:36AM 15    read the document.

        16    Q    BY MS. SPROULE:  Agent Chavez, I'd like to count the --

        17    go back to the question about how many bank branches were

        18    involved.  Let's count them together if we could.  If you could

        19    just count them out loud.

10:37AM 20    A    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16.

        21    Q    Thank you.

        22         Based on what you learned from your review of the bank

        23    records, did you obtain a seizure warrant?

        24    A    Yes, I did.

10:37AM 25    Q    For what?
```

```
 1  A    For the Lamborghini.  The 2006 Lamborghini.

 2  Q    And again, that was the -- I'm moving back to Exhibit 3,

 3  Government's Exhibit 3.  Did you obtain a seizure warrant for

 4  this Lamborghini listed here on this Form 8300?

 5  A    That's correct, yes.

 6  Q    I'm going to show you what's been marked as Government's

 7  Exhibit 4.  Do you recognize this?

 8  A    Yes.

 9  Q    What is it?

10  A    Seizure warrant for the Lamborghini.

11  Q    Is this a seizure warrant that you obtained from a

12  magistrate judge?

13  A    I did.

14          MS. SPROULE:  Move to admit Exhibit 4, Your Honor.

15          THE COURT:  Who is the magistrate judge?

16          MS. SPROULE:  I believe it's -- there's some glare,

17  Your Honor.  Magistrate Nakazato.

18          THE COURT:  Exhibit 4 is received.

19          (Exhibit No. 4 received.)

20  Q    BY MS. SPROULE:  What was the basis for your seizure

21  warrant?

22  A    The basis was structuring.

23  Q    And what did the structuring have to do with the

24  Lamborghini?

25  A    The payments were structured in order to purchase the
```

10:37AM (line 5)
10:38AM (line 10)
10:38AM (line 15)
10:38AM (line 20)
10:38AM (line 25)

```
       1    Lamborghini.

       2    Q     Did you serve that seizure warrant on February 1st, 2012?

       3    A     Correct.

       4    Q     Where?

10:39AM 5    A     I served it to the Irwindale Police Department.

       6    Q     And what happened there?

       7    A     We seized the vehicle.

       8    Q     All right.  I'm going to show you what's marked as

       9    Government's Exhibit 1.

10:39AM 10          THE COURT:  Just a moment.  What exhibit is this?

      11          MS. SPROULE:  Government's Exhibit 1.

      12          THE COURT:  Thank you.

      13    Q     BY MS. SPROULE:  Do you recognize this?

      14    A     Yes.

10:39AM 15   Q     What is it?

      16    A     The 2006 Lamborghini.

      17    Q     Is this a fair and accurate representation of what the

      18    vehicle looked like on the day it was seized?

      19    A     Yes, it is.

10:39AM 20   Q     I'm going to show you Page 2, Government's Exhibit 1.  Is

      21    this another picture of that same Lamborghini?

      22    A     Yes, it is.

      23          MS. SPROULE:  Your Honor, we move to admit

      24    Government's Exhibit 1.

10:40AM 25          THE COURT:  So while we have Exhibit 1-A and -B, the
```

**UNITED STATES DISTRICT COURT**

36

1    first photograph, I believe, was the front -- looking at the
2    Lamborghini from the front, that would be 1-A.  1-B is the
3    Lamborghini from the looking at the rear portion.  Received.
4              **(Exhibit No. 1 received.)**
10:40AM 5            MS. SPROULE:  We have nothing further, Your Honor.
6              THE COURT:  Okay.  Cross-examination, please.
7                      **CROSS-EXAMINATION**
8    BY MR. NORMANDIN:
9    Q    Good morning, Ms. Chavez.  My name is Tom Normandin.  I
10:40AM 10   represent NextGear Capital, Inc., a claimant in this matter.
11   Would you look at Exhibit 1 in front of you and tell me if this
12   is part of that Exhibit 1.
13             MS. SPROULE:  Objection, Your Honor.  It is not part
14   of Exhibit 1.
10:40AM 15            THE COURT:  Just a moment.  Just a minute.
16        So what he's asking you is when you look at the
17   Lamborghini, were these license plates on the Lamborghini?
18             THE WITNESS:   I believe so.
19             THE COURT:  Okay.
10:41AM 20            MR. NORMANDIN:  Move to admit Exhibit -- it's been
21   premarked as Exhibit 1-3, or 1-C.
22             THE COURT:  Whatever you prefer.
23             MR. NORMANDIN:  1-C.
24             THE COURT:  Keep your normal order just so there's
10:41AM 25   no confusion for U.S. counsel.  I care more about your

```
 1   presentations as long as we have markings.  So 1-C, are you
 2   comfortable with that?
 3               MR. NORMANDIN:  I am.  And 1-C is received.
 4               THE COURT:  It's received?
 5               (Exhibit No. 1-C received.)
 6   Q    BY MR. NORMANDIN:  Do you recognize the dealer number of
 7   52154?
 8   A    Do I recognize it --
 9   Q    As a particular dealer's number.
10   A    No.
11   Q    Do you come across a dealer's number in investigating
12   Ramate?
13   A    I don't recall this as a dealer number.
14               THE COURT:  Is that a dealer number plate?  Is that
15   the way dealer numbers proceed the DLR?  And you may not know.
16               THE WITNESS:   I think DLR is the dealer, but I
17   don't recognize the number to the business.
18               THE COURT:  You don't recognize that tied to a
19   specific entity like Lamborghini or Ramate?
20               THE WITNESS:   Correct.
21   Q    BY MR. NORMANDIN:  In your investigation did you look and
22   see whether or not Ramate was a licensed California auto
23   dealer?
24               MS. SPROULE:  Your Honor, I object to all of this.
25   None of this is relevant to the forfeiture of this vehicle.
```

**UNITED STATES DISTRICT COURT**

38

```
            1              THE COURT:  Overruled.

            2         You can now answer the question.

            3              THE WITNESS:  Can you ask it again.

            4    Q    BY MR. NORMANDIN:  Sure.  In your investigation for this

10:42AM     5    forfeiture action, did you investigate whether or not Ramate

            6    was a licensed California auto dealer?

            7    A    No.  Just investigated them as a business.

            8    Q    Okay.  You didn't pull any Department of Motor Vehicles

            9    records regarding Ramate, did you?

10:43AM    10    A    No, I did not.

           11    Q    Did you find out who some of Ramate's creditors may be in

           12    your investigation?

           13    A    No, I don't think so.

           14    Q    Were you trained to look and to see whether or not a

10:43AM    15    business' license in connection with your training --

           16              MS. SPROULE:  Objection.  Relevance.

           17              THE COURT:  Overruled.

           18              THE WITNESS:  We run businesses to see if they're

           19    licensed.  If they're incorporated.

10:43AM    20    Q    BY MR. NORMANDIN:  Did you run a -- any type of search to

           21    see whether or not Ramate was incorporated under the laws of

           22    the State of California?

           23    A    They are -- at the time that I started the investigation,

           24    they were incorporated.

10:43AM    25    Q    Were you trained on how to determine whether or not a
```

**UNITED STATES DISTRICT COURT**

```
 1   business was legitimate or not legitimate?

 2              MS. SPROULE:  Objection.  That's ambiguous and

 3   irrelevant.

 4              THE COURT:  I think it may be, Counsel.  Just

10:44AM 5   restate that.  And legitimate, illegitimate, that's the problem

 6   I'm having.  But the area of inquiry is appropriate.

 7   Q    BY MR. NORMANDIN:  Have you received any training in

 8   determining whether a business is a legitimate business

 9   concern, a legitimate business organization?

10:44AM 10             MS. SPROULE:  Objection.  Ambiguous.

11             THE COURT:  Well, I'm going to -- "legitimate"

12   meaning?

13             MR. NORMANDIN:  Maybe I should -- well, it's a term

14   that the witness used in her Declaration found at Exhibit 4-5.

10:44AM 15   Maybe I should start there.  So it's her term.

16             THE COURT:  I don't have 4-5 in front of me.  Put up

17   4-5.

18        Did you use that term?

19             THE WITNESS:  I don't recall.

10:44AM 20             THE COURT:  Okay.  Let's find out.  Put up 4-5.

21   Q    BY MR. NORMANDIN:  Do you recognize this as Page 2 of

22   your Declaration that you submitted in obtaining the --

23             THE COURT:  I see, Counsel.  It's Subsection B.  The

24   objection is overruled.  She can explain what that is in her

10:45AM 25   Declaration.
```

40

|   |   |
|---|---|
| | 1 |          THE WITNESS:  Well, when we work an investigation,
| | 2 | we do run checks to see if it's an actual legitimate business.
| | 3 | And throughout the course of the investigation, it can turn out
| | 4 | that it's illegitimate.
| 10:45AM | 5 | Q     Excuse me?
| | 6 | A     Illegitimate.  Not a current business.
| | 7 | Q     How did you reach the conclusion that Ramate was not a
| | 8 | legitimate business concern?
| | 9 | A     I don't think I ever said it was not legitimate.
| 10:45AM | 10 | Q     Do you have an opinion today as to whether or not at the
| | 11 | time the vehicle was purchased from Lamborghini Newport Beach,
| | 12 | Ramate was a legitimate business concern?
| | 13 | A     I believe when I seized the vehicle, I wasn't looking into
| | 14 | the investigation of Ramate.
| 10:46AM | 15 | Q     You were only focusing on the funds; correct?
| | 16 | A     Correct.  The vehicle was purchased with structured
| | 17 | proceeds from an individual.  I was looking for the individual.
| | 18 | Q     When did you receive information that this structuring
| | 19 | had occurred?  When did you first receive that information?
| 10:46AM | 20 | A     Around October 2011 or before.
| | 21 | Q     What was the source of that information that you first
| | 22 | received?
| | 23 | A     It was bank records from U.S. Bank.
| | 24 | Q     Did U.S. Bank file a Form 8304 -- excuse me, Form 8300?
| 10:47AM | 25 | Did U.S. Bank file a form?

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | A     No.  That form is filed by the business. |
| 2 | Q     Isn't it, based upon your experience, the requirement of |
| 3 | a financial institution to report deposits such as these? |
| 4 | A     The financial institution would be filing CTRs, not 8300s. |
| 10:47AM 5 | THE COURT:  For the record, I know what a CTR is, |
| 6 | but an appellate court might not. |
| 7 | THE WITNESS:  Oh, okay.  CTR is a Currency |
| 8 | Transaction Report, and those are filed by the bank |
| 9 | institutions. |
| 10:47AM 10 | Q     Did you see whether or not U.S. Bank had filed any CTRs |
| 11 | in connection with this -- |
| 12 | MS. SPROULE:  Objection, Your Honor. |
| 13 | MR. NORMANDIN:  -- structuring. |
| 14 | MS. SPROULE:  Whether the bank filed a CTR is |
| 10:47AM 15 | completely irrelevant to the structuring.  And I have cases on |
| 16 | that point. |
| 17 | THE COURT:  Overruled. |
| 18 | Answer the question. |
| 19 | THE WITNESS:  Yes, they did have a CTR. |
| 10:47AM 20 | Q     BY MR. NORMANDIN:  Do you have possession of those CTRs? |
| 21 | A     Yes. |
| 22 | Q     Now, you made -- when did you first make contact with |
| 23 | Mr. Zugasti? |
| 24 | A     October 2011, I believe. |
| 10:48AM 25 | Q     And you made -- you arranged to meet with him; correct? |

```
 1    A      No.  I went to the business looking for Luis Perez.

 2    Q      But you met Mr. Zugasti there; correct?

 3    A      Yes.

 4    Q      And you informed Mr. Zugasti that someone had purchased a

 5    Lamborghini; correct?

 6    A      Correct.

 7    Q      And what was Mr. Zugasti's response when you brought that

 8    up to him?

 9    A      He said he didn't know anything about it.

10    Q      Did you give Mr. Zugasti any information about the

11    purchase documents at Lamborghini Newport Beach?

12    A      Did I give Mr. Zugasti anything?

13    Q      Yes.

14    A      No, I did not.

15    Q      From the time you had your conversation with Mrs. Zugasti

16    in October of 2011, to your knowledge, has Mr. Zugasti ever

17    made claim to that vehicle on behalf of Ramate?

18              MS. SPROULE:  Objection, Your Honor.  Relevance.

19              THE COURT:  Overruled.

20         You can answer the question, please.

21              THE WITNESS:  Not that I know of.  Not that I'm

22    aware of.

23    Q      BY MR. NORMANDIN:  To your knowledge, has Mr. Zugasti

24    ever sought to correct the Department of Motor Vehicles

25    information showing Ramate's interest in the vehicle?
```

```
  1   A     Not that I know of.

  2   Q     To your knowledge has Mr. Zugasti ever contacted

  3   Lamborghini Newport Beach to say Ramate is not an owner, has no

  4   interest in that vehicle?

10:49AM 5  A     Not that I know of.

  6   Q     Did you suggest or say directly to Mr. Zugasti that

  7   deportation was an issue for him to consider when he was

  8   answering your questions?

  9            MS. SPROULE:  Objection, Your Honor.  This is

10:50AM 10  hearsay.  It assumes facts not in evidence.  Argumentative.

 11            THE COURT:  Sustained.

 12   Q     BY MR. NORMANDIN:  Did you state to Mr. Zugasti that --

 13            THE COURT:  Counsel, any part of this conversation

 14   is going to end up being hearsay.  You can go ahead and ask it

10:50AM 15  for the record.

 16   Q     BY MR. NORMANDIN:  Did you say to Mr. Zugasti that he was

 17   at risk for being deported in connection with this Lamborghini?

 18   A     Never.

 19            THE COURT:  The answer is "never"?

10:50AM 20            THE WITNESS:  Never.  Uh-huh.

 21   Q     BY MR. NORMANDIN:  What words did Mrs. Zugasti use --

 22            MS. SPROULE:  Objection.  Hearsay.

 23            THE COURT:  Counsel, finish your question.

 24   Q     BY MR. NORMANDIN:  What words did Mr. Zugaste use in

10:50AM 25  saying that he didn't know anything about the Lamborghini?
```

1          MS. SPROULE:  Objection.  Hearsay.

2          THE COURT:  Counsel, why isn't that hearsay?  I'm

3    trying to get more evidence and not less for both of you, but

4    why isn't that hearsay?

10:51AM 5          MR. NORMANDIN:  Well, Mrs. Zugaste was a claimant in

6    this action.

7          THE COURT:  No, but what's the legal exception to

8    this?  Is there one?

9          MR. NORMANDIN:  No, Your Honor.

10:51AM 10          THE COURT:  Okay.  Then continue.

11   Q    BY MR. NORMANDIN:  Had you investigated Ramate at any

12   time before October of 2011?

13   A    No.  I don't think so.

14   Q    Were you involved in any type of seizure in connection

10:51AM 15   with cash at Lamborghini Newport Beach before October 2011?

16   A    Yes.  With Lamborghini Newport Beach.

17   Q    And when did that investigation occur?

18          MS. SPROULE:  Objection.  This is completely

19   irrelevant.  Whether cash was seized from the car dealership

10:51AM 20   selling the car has nothing to do with this case.

21          THE COURT:  Overruled.

22      You can answer the question.

23          THE WITNESS:  I served a seizure warrant on

24   Lamborghini Newport Beach.  I don't recall.  I think it was

10:52AM 25   2011 as well.  I think it's attached to this affidavit on this

```
 1    seizure.
 2    Q    Why don't you take a look at Exhibit 4 in front of you.
 3    And in particular 4- --
 4                THE COURT:  4 dash what, Counsel?
 5                MR. NORMANDIN:  I'm sorry, Your Honor?
 6                THE COURT:  You said "4 dash," and then I didn't
 7    hear what the dash was.
 8                MR. NORMANDIN:  If I could just have a moment,
 9    Your Honor.  I want to make sure I have the correct --
10                THE COURT:  Or you can refer to the page.  It
11    doesn't matter.  But you said "4 dash," and then I didn't hear
12    a number.
13    Q    BY MR. NORMANDIN:  Look at Page 4-14, Ms. Chavez.  I'll
14    put that up on the -- do you recognize this as an affidavit
15    that you signed in connection with a 2010 -- my apologies.
16    We're looking at Exhibit 4, which is in evidence, 4-15.  And at
17    the top it talks about a purchase by Ramate of a 2010
18    Lamborghini from Lamborghini Newport Beach in September of 2010
19    resulting in a seizure of $45,819.12.  You were involved in
20    that seizure; correct?
21    A    Yes, I was, but it wasn't in -- I don't think it was 2010.
22    Q    It involved a 2010 --
23    A    The vehicle was a 2010, but the case was not in 2010.
24    Q    In any event, it was a case that preceded the case that
25    we're talking about right now; correct?
```

**UNITED STATES DISTRICT COURT**

```
 1   A      Correct.

 2   Q      So this was the second time you investigated Lamborghini

 3   Newport Beach and Ramate in connection with the purchase of a

 4   Lamborghini; correct?

 5   A      I don't think the first time I looked into Ramate, when I

 6   did the seizure on Lamborghini --

 7            THE COURT:  Just a moment.  So Ramate del Monte

 8   purchased a 2010 Lamborghini from Lamborghini Newport Beach in

 9   September 2010 resulting in the seizure of $45,819.12?

10            THE WITNESS:  Yes.

11            THE COURT:  In brief, Ramate del Monte purchased a

12   2010 Lamborghini Murcielago, M-u-c-i-e-l-a-g-o, and then the

13   VIN number on or about September 23rd, 2010.  Ramate del Monte

14   caused restructuring of cash deposits in the amount of

15   $311,988 -- am I reading that correctly?

16            THE WITNESS:  Yes.

17            THE COURT:  -- into an account in the name of

18   Lamborghini Newport Beach over a five-day period.  And then it

19   goes on to state:

20            "On September 10, 2011, the Honorable Arthur

21        Nakazato, United States Magistrate Judge, felt

22        probable cause to issue a warrant."

23        So obviously this is a second incident involving both

24   Lamborghini of Newport Beach and Ramate, and this occurs before

25   you did the investigation -- or I'm sorry, it's separate than
```

**UNITED STATES DISTRICT COURT**

```
 1   the investigation concerning the 2006 Lamborghini; is that

 2   correct?

 3          THE WITNESS:  Correct.  I did a seizure warrant for

 4   the 2010, and then --
```

5          THE COURT:  And now you're doing the seizure warrant

```
 6   for the 2006.  And you're mentioning the prior investigation of

 7   Ramate and Lamborghini concerning the 2010 in this affidavit

 8   for the 2006?

 9          THE WITNESS:  Right.  This is for the 2006 seizure.
```

10         THE COURT:  Okay.  Got it, Counsel.

```
11       So Ramate is involved in this transaction also, this 2010

12   from your perspective, structuring?

13          THE WITNESS:  They were.  But at the time I wasn't

14   looking into Ramate.  That was your question?
```

15  Q    BY MR. NORMANDIN:  My question is, didn't your

```
16   investigation show that Ramate had purchased several high-end

17   cars from Lamborghini Newport Beach?

18   A    Just two of them.

19   Q    Correct.  Did you do any other investigation to see
```

20  whether or not Ramate dealt in high-end cars, such as a

```
21   Lamborghini or expensive Mercedes-Benzes?

22   A    I asked that question of Zugaste himself, and he said

23   "no."

24          MR. NORMANDIN:  Your Honor, move to strike as
```

25  hearsay.

```
 1                THE COURT:  Sustained.  Unless there's an exception,
 2      Counsel.
 3                MS. SPROULE:  No, Your Honor.  Counsel asked the
 4      question Your Honor.  He doesn't like the answer.  He moved to
10:59AM  5      strike it.
 6                THE COURT:  Okay.  But the answer is stricken.  It's
 7      hearsay obviously.  Now you two both can reach an agreement and
 8      let in all the hearsay you want as long as it's co-equal.  Or
 9      we can go by the rules, and the rule would be hearsay.
10:59AM 10                MS. SPROULE:  Absolutely, Your Honor.  He asked the
11      question.
12                THE COURT:  Okay.
13      Q    BY MR. NORMANDIN:  I don't think I have anything further
14      at this time, Your Honor.  I would ask the witness be available
10:59AM 15      for examination in our case.
16                THE COURT:  Oh, I think she'll be here, Counsel.  I
17      don't think she's going anyplace.
18                MS. SPROULE:  Very briefly, Your Honor.
19                        REDIRECT EXAMINATION
11:00AM 20      BY MS. SPROULE:
21      Q    Agent Chavez, when you say in your affidavit that Ramate
22      del Monte purchased a car, where did you get the information
23      that Ramate is purchasing that car?
24      A    From the Form 8300.
11:00AM 25      Q    Do you have any independent knowledge of who purchased
```

UNITED STATES DISTRICT COURT

```
 1   that car at the time that you wrote your affidavit?

 2   A    I didn't know who purchased it at the time that I wrote

 3   the affidavit.

 4   Q    And again, where does the information on the Form 8300

 5   come from?

 6   A    From the business.  In this case, Lamborghini Newport

 7   Beach.

 8   Q    Would it come from information that somebody else, the

 9   purchaser, told them?

10        MR. NORMANDIN:  Objection.  Calls for hearsay, lacks

11   foundation.

12        THE COURT:  Sustained.

13   Q    BY MS. SPROULE:  Where in your training and experience

14   would the information that the business received to put on the

15   8300 come from?

16        MR. NORMANDIN:  Objection.  Relevance.

17        THE COURT:  Overruled.

18        You can answer that question.

19        THE WITNESS: The information on a Form 8300 comes

20   from the accountant or controller within that business.

21   Q    BY MS. SPROULE:  And based on your training and

22   experience, where would that person get that information?

23   A    From the individual who made the purchase or the

24   individual who -- yeah, who made the purchase and had the funds

25   over $10,000.
```

**UNITED STATES DISTRICT COURT**

|  | |
|---|---|
| 1 | MS. SPROULE:  I have nothing further, Your Honor. |
| 2 | THE COURT:  Recross? |
| 3 | **RECROSS—EXAMINATION** |
| 4 | BY MR. NORMANDIN: |
| 11:01AM 5 | Q    Who was the person -- who was the person that made the |
| 6 | purchase in this case? |
| 7 | MS. SPROULE:  Objection, Your Honor.  Lack of |
| 8 | knowledge. |
| 9 | THE COURT:  According to the form anyway, 8300; is |
| 11:01AM 10 | that correct, Counsel?  In other words, you're asking for a |
| 11 | conclusion, and -- well I'm going to sustain the objection. |
| 12 | You can ask about what the form indicates, but just who made |
| 13 | the purchase. |
| 14 | MR. NORMANDIN:  Thank you, Your Honor. |
| 11:02AM 15 | Q    Did you do any investigation to see who actually |
| 16 | purchased the -- the person who actually appeared in front of |
| 17 | Lamborghini Newport Beach to make the purchase, did you find |
| 18 | out who that person was? |
| 19 | A    Yes.  Through interviews. |
| 11:02AM 20 | Q    Who did you find that out to be? |
| 21 | MS. SPROULE:  Objection.  Hearsay. |
| 22 | THE WITNESS:  An individual -- |
| 23 | MS. SPROULE:  Objection. |
| 24 | THE COURT:  Overruled.  First I need more foundation |
| 11:02AM 25 | about what this is before I determine if it's hearsay or not. |

**UNITED STATES DISTRICT COURT**

```
     1    What did you do?  Tell me about your investigation.
     2              THE WITNESS:  My investigation was based on
     3    interviews and --
     4              THE COURT:  Okay.  So this information is coming
11:02AM  5    from interviews.
     6              THE WITNESS:  From interviews.
     7              THE COURT:  Sustained.  It's hearsay.
     8              MR. NORMANDIN:  Thank you, Your Honor.  Nothing
     9    further subject to recall.
11:02AM 10              THE COURT:  Once again, Counsel, she's not going
    11    anyplace.  No witnesses are excused till tonight.
    12         Now Counsel, is there any objection to her remaining?
    13              MR. NORMANDIN:  No, Your Honor.
    14              MS. SPROULE:  No.
11:02AM 15              THE COURT:  I will pay the same courtesy to the
    16    person who testifies.  Do you have anything further?
    17              MS. SPROULE:  We don't.  The government rests its
    18    case on the forfeitability on the asset.
    19              THE COURT:  Why don't we take a break.  We'll meet
11:03AM 20    at a quarter after the hour.
    21              (Recess from 11:03 a.m. to 11:42 a.m.)
    22              THE COURT:  Counsel, thank you for your patience.
    23    We had a number of other matters obviously.
    24         Counsel on behalf of the defense.
11:43AM 25              MR. NORMANDIN:  Thank you, Your Honor.
```

1    We'd first like to bring our motion to dismiss for the

2    failure of the government to carry its burden of proof in this

3    case.  They have provided you insufficient evidence from which

4    the findings necessary for a forfeiture can be found.  In

11:43AM 5    particular, there was, in fact, an 8300 form filed.  But more

6    importantly, there was no evidence of any structuring in terms

7    of this not being a legitimate business, in terms of this not

8    being a cash business.  No investigation was done.  No evidence

9    was presented to this Court as to what kind of business Ramate

11:43AM 10    is.

11    We know it's a licensed business pursuant to the State of

12    California Department of Corporations.  We don't know who its

13    creditors are.  We don't know who its investors are.  We don't

14    know who an agent may have been, who approached Lamborghini

11:43AM 15    Newport Beach.  It's insufficient for there to be these kinds

16    of deposits that were presented to the Court for there to be

17    finding of structure.

18    Just because a -- an entity elects to proceed under the

19    radar with small cash transactions, even spread out like that,

11:44AM 20    is insufficient to rise to the level of structure.  Thank you,

21    Your Honor.

22    THE COURT:  Denied.

23    Now Counsel, your first witness, please.

24    MR. NORMANDIN:  Troy Rogers, Your Honor.

11:44AM 25    THE COURT:  Sir, if you'd be kind enough.  If you'd

```
 1    raise your right hand.
 2                  TROY ROGERS, DEFENDANT WITNESS, WAS SWORN
 3                  THE COURT:  The entrance to the witness box is over
 4    here just to the left, closest to the wall.  Have a seat.  Turn
 5    around, use the microphone, and state your full name.
 6                  THE WITNESS:  My name is Troy Rogers.
 7                  THE COURT:  Sir, spell your last name, please.
 8                  THE WITNESS:  R-o-g-e-r-s.
 9                  MR. NORMANDIN:  May I proceed, Your Honor?
10                  THE COURT:  Just one moment, please.  Once again,
11    state your full name one more time for me, please.
12                  THE WITNESS:  Troy Rogers.
13                  THE COURT:  Would you spell your last name once
14    again, sir.
15                  THE WITNESS:  R-o-g-e-r-s.
16                  THE COURT:  Thank you.
17              Direct examination, please.
18                          DIRECT EXAMINATION
19    BY MR. NORMANDIN:
20    Q     Mr. Rogers, by whom are you employed?
21    A     I am employed by NextGear Capital.
22    Q     How long have you been employed by NextGear?
23    A     NextGear Capital for three years now.
24    Q     And before that?
25    A     Before that I was with Dealer Services Corporation.  And
```

11:44AM (line 5)
11:45AM (line 10)
11:45AM (line 15)
11:45AM (line 20)
11:45AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    NextGear Capital came about when Cox Communications bought out

 2    DSC, Dealer Services Corporation.

 3              THE COURT:  I'm sorry, "bought out" -- very slowly.

 4    Who?  Pronounce it again.

 5              THE WITNESS:  Cox Communications?

 6              THE COURT:  Bought out D- --

 7              THE WITNESS:  DSC.

 8              THE COURT:  There we go.

 9         Now, pull the microphone closer.  Not your fault, it's

10    mine.  Say that slowly again.  DFC?

11              THE WITNESS:  DSC.  It's --

12              THE COURT:  DSC?

13              THE WITNESS:  Yes, sir.

14              THE COURT:  Like delta --

15              THE WITNESS:  Delta, Sierra, Charlie.

16              THE COURT:  Excellent.

17         Now, Counsel.

18    Q    BY MR. NORMANDIN:  And what was your position at DSC and

19    then later NextGear?

20    A    I was a branch manager for DSC and then an account

21    executive for NextGear Capital.

22    Q    What did you do as an account executive?

23    A    My position as account executive was to manage a

24    portfolio, essentially lend money to dealers, car dealers, and

25    manage the portfolio and collect money back.
```

11:46AM (line 5)
11:46AM (line 10)
11:46AM (line 15)
11:46AM (line 20)
11:47AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   Q     Okay.  Describe generally what the business is of DSC and
 2   now NextGear.  What do they do?
 3   A     We are a collateralized lender for lines of credit for
 4   floor planning, which purchase -- basically the purchase of the
11:47AM 5   dealer's inventory.  Whether it be through auction or, you
 6   know, if they purchase a trade-in or buy from another
 7   wholesaler or something like that.
 8              THE COURT:  NextGear, you're a lender; is that
 9   correct?
11:47AM 10              THE WITNESS:  Yes, sir.
11   Q     BY MR. NORMANDIN:  And do you take collateral when you
12   lend out the money?
13   A     Yes.  All our notes security agreement, our contracts, we
14   are a collateralized lender.  All assets of the individual in
11:48AM 15   the company are placed as security.
16   Q     Who are your customers?
17   A     Primarily used car non-franchised dealers.
18   Q     What do you mean by "non-franchised dealers"?
19   A     Well, not your big new car stores, but we have recently
11:48AM 20   gone into that arena.  But at the time it was just used car --
21   used car dealers, wholesale retail operations.
22   Q     Would NextGear make a loan to an unlicensed dealer?
23   A     No.  All the dealers have a California dealer's license --
24   well, their state dealer's license.
11:48AM 25              THE COURT:  I'm sorry, their what?
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  Their state.  Whatever state they're

 2    in, they have a dealer's license.  We're located across the

 3    U.S.

 4              THE COURT:  So you're basically a collateralized

11:49AM 5    lender.  And what I've gotten out of your testimony so far,

 6    you're dealing with dealers who have licenses; is that correct?

 7              THE WITNESS:  That is correct.

 8    Q    BY MR. NORMANDIN:  Okay.  Do you lend to consumers?

 9    A    No, sir.  We are not licensed for consumer lending.

11:49AM 10   Q    Now, you mentioned that NextGear is a subsidiary of

11    Manheim Investments?

12              THE COURT:  I'm sorry, very slowly.  Of who?

13              MR. NORMANDIN:  Manheim Investments.

14              THE COURT:  Thank you.

11:49AM 15   Q    BY MR. NORMANDIN:  And Exhibit 124, is this the larger

16    document in which Manheim Automotive Financial Services merged

17    into Dealer Services Corporation?

18    A    That is correct.

19              MR. ROWE:  Your Honor, if it may help move this

11:50AM 20   along, the government is prepared to stipulate that NextGear is

21    a proper successor party in interest to DSC and their security

22    interest in Ramate del Monte.

23              THE COURT:  Do you want to -- you don't have to

24    enter into a stipulation.  Do you want to do that?

11:50AM 25             MR. NORMANDIN:  I do.
```

```
 1                    THE COURT:  Then why don't you two draft it.  Just
 2       take your pen and pencil so we're not doing this on the fly.
 3                    MS. SPROULE:  Parties are prepared to stipulate.
 4                    THE COURT:  Would you like to read the stipulation?
11:52AM 5             MS. SPROULE:  I would.
 6              "The parties stipulate that NextGear is a
 7         successor in interest to DSC, and that NextGear is
 8         a subsidiary of Manheim Investments, Inc.  And
 9         NextGear had a security interest in all assets of
11:52AM 10        Ramate del Monte at all material times."
11                   THE COURT:  Is that stipulated to by the government?
12                   MS. SPROULE:  Yes, Your Honor.
13                   THE COURT:  And also by the defense?
14                   MR. NORMANDIN:  If I can inquire to the witness and
11:52AM 15      make sure that --
16       Q    Mr. Rogers, did you hear the stipulation?
17       A    Yes, I did.
18       Q    Is it accurate?
19       A    It is accurate.
11:52AM 20            THE COURT:  Now if I could have that well-written
21       document for a moment.
22                   MS. SPROULE:  Yes, Your Honor.
23                   THE COURT:  Give that to the clerk.
24            You can continue, please.
11:52AM 25     Q    BY MR. NORMANDIN:  As part of your duties, Mr. Rogers,
```

```
          1    for NextGear, do you come into contact with the business

          2    records of NextGear?

          3    A     Yes, I am a custodian for the records and generally run

          4    various reports, you know, on a daily-type basis.

11:53AM   5    Q     Okay.  Was Ms. Ramate one of your customers?

          6    A     Yes, they were.

          7    Q     And I put up Exhibit 102, Mr. Rogers, and is this an

          8    application from Ramate for a line of credit?

          9    A     That is an application for a line of credit.

11:54AM  10    Q     Dated August 23rd, 2005?

         11    A     That is correct.

         12    Q     Has Ramate been -- or was Ramate a customer of NextGear

         13    since 2005?

         14    A     They were a customer since 2005, but I was transferred out

11:54AM  15    here in 2007.  So they were a customer of mine since 2007.

         16    Q     In the middle of this application, there's a reference to

         17    a dealer number of 52154.  Is that the dealer number for

         18    Ramate?

         19    A     That is the dealer number of -- the state dealer number

11:54AM  20    for Ramate, yes.

         21    Q     That's not a number assigned by NextGear?

         22    A     No, that is a number that the DMV, I believe, assigns.

         23          MR. NORMANDIN:  Move 102 into evidence.

         24          THE COURT:  Received.

11:55AM  25          (Exhibit No. 102 received.)
```

```
 1    Q    BY MR. NORMANDIN:  Exhibit 103 is an updated application,

 2    is it not?

 3    A    That is correct.

 4    Q    And this was in 2010 that the Ramate applied for credit;

 5    correct?

 6    A    Well, they had continuing line of credit, but there was a

 7    change in ownership where the -- Raul Zugaste and Cecilia

 8    became partners or each equal partners.

 9              MR. ROWE:  Objection.  Speculation, Your Honor.

10              THE COURT:  Sustained.

11    Q    BY MR. NORMANDIN:  If you compare Exhibit 102, which is

12    in evidence with 103, it reflects a change in ownership; is

13    that correct?

14    A    There is a change in ownership.  And part of our contract

15    states when they do have a change in ownership, that they

16    advise us.  So we were advised of a change in ownership, and we

17    signed new contract documents.  At that time another member was

18    added onto the contract.

19    Q    So if we look at 103, we can see that Ms. Mariscal is a

20    50 percent owner, and Mr. Zugaste is a 50 percent owner;

21    correct?

22    A    That is correct.

23    Q    And that was the reason why the change was required?

24    A    That was the reason we did a new contract, yes, sir.

25              MR. NORMANDIN:  Move 103 into evidence.
```

11:55AM  (line 5)
11:55AM  (line 10)
11:55AM  (line 15)
11:56AM  (line 20)
11:56AM  (line 25)

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Received.  I'm sorry, received.  Thank
 2     you, Counsel.
 3              (Exhibit No. 103 received.)
 4     Q    BY MR. NORMANDIN:  What is Exhibit 106?
11:56AM 5     A    That is the dealer's demand and promissory note.
 6     Promissory note and security agreement that all dealers, when
 7     they get a line of credit with DSC or NextGear, must sign.
 8     Q    And is it this document that grants us security interest
 9     in the assets of Ramate?
11:56AM 10    A    It -- yes, it does grant the security interest and all the
11     assets and the future assets that are required no matter where
12     they're located.
13     Q    Both the collateral that existed at the time the demand
14     note is signed and any after-acquired collateral?
11:57AM 15    A    Yes, sir.
16              MR. NORMANDIN:  Move 106 into evidence.
17              THE COURT:  Received.
18              (Exhibit No. 106 received.)
19     Q    BY MR. NORMANDIN:  Pursuant to stipulation, Your Honor, I
11:57AM 20    move Exhibits 15 and 16 into evidence?
21              THE COURT:  Sorry 15 and 16 or 615?
22              MR. NORMANDIN:  15 and 16.
23              THE COURT:  15 and 16.
24              MR. NORMANDIN:  They're the certified copies of the
11:57AM 25    UCC-1 filings.
```

```
 1              THE COURT:  Any objection, Counsel?
 2              MR. ROWE:  No, Your Honor.
 3              THE COURT:  Received.  15 and 16 are received.
 4              THE COURTROOM DEPUTY:  Judge, they're 115 and 116.
11:57AM  5     THE COURT:  They're 115 and 116; is that correct,
 6  Counsel?
 7              MR. NORMANDIN:  Thank you, Your Honor.  That is
 8  correct.
 9              THE COURT:  Just a moment.  Let's slow down.  115
11:58AM 10  and 116 are received into evidence.  15 and 16 were mislabeled.
11              (Exhibit No. 115 and 116 received.)
12              THE COURT:  Counsel, your next question.
13  Q    BY MR. NORMANDIN:  Did you have personal contact with the
14  owners of Ramate?
11:58AM 15  A    Yes, I did.  Typically at least once a month we would
16  perform or clear up lot audits.  As part of the stipulation of
17  the contract, we do perform collateral audits on the
18  dealership.  So on average probably once a month we would visit
19  the lot.
11:58AM 20  Q    And what about -- what were the types of communications
21  that you had with your customer Ramate?
22  A    Well, general, you know, "How's business going?"  "How
23  many cars are you selling?"  What -- you know, "What's new in
24  the area?"  Just a range of them.  But pretty much, you know,
11:58AM 25  who they sold their cars to, how many they were selling, and
```

```
  1   any, you know, inventory, if it wasn't accounted for, where it
  2   was at.
  3   Q    Did you see the turnover of their inventory from time to
  4   time?
11:59AM 5   A    Yes.  They had a very large lot, and it looked --
  6   according to Raul, he told me that they sold about --
  7              MR. ROWE:  Objection.  Hearsay.
  8              THE COURT:  Sustained.
  9          Just restate the question.  This is proper area.  Just got
11:59AM 10   a little hearsay in there.
 11   Q    BY MR. NORMANDIN:  In terms of what you observed the
 12   number of cars being moved on a monthly or annual basis, were
 13   you able to see the level of sales that Ramate engaged in?
 14   A    Yes.  They were one of the higher volume dealers in
11:59AM 15   El Monte.  It looked to me like they sold probably between 30
 16   and 40 cars a month.
 17   Q    Okay.  And if you look at Exhibit 108, do you recognize
 18   this as a receivable detail report?
 19   A    Yes, that is a receivable detail report.
12:00PM 20   Q    And what does this report reflect generally?
 21   A    Generally it's a report of all units that are floored at
 22   any given time.
 23   Q    And if you look at the third page at 10 -- excuse me, the
 24   second page, 108-2, about six lines over, there's a column
12:00PM 25   called "stock number."  Do you see that?
```

```
  1   A      I do.

  2   Q      What does this stock number mean?

  3   A      That is a sequential order of how many units the dealer

  4   has floored with NextGear.  So for this guy, he's on his

12:00PM 5   1,033rd unit, so he's been dealing with us for 1,033

  6   transactions.

  7   Q      1,033 cars?

  8   A      1,033 cars.

  9           MR. NORMANDIN:  Move 108 into evidence.

12:00PM 10          THE COURT:  Received.

 11           (Exhibit No. 108 received.)

 12   Q      BY MR. NORMANDIN:  Did you observe other -- other than

 13   the flooring that was provided by NextGear to Ramate, did you

 14   observe any other sources of flooring or inventory supplied to

12:01PM 15   Ramate?

 16   A      I don't really know of any other floor plans that he had.

 17   It was my impression that he owned about half the inventory.

 18           THE COURT:  "He" being whom?

 19           THE WITNESS:  Well, Ramate.

12:01PM 20          THE COURT:  Ramate.  So when you say "he," you're

 21   referring to the company Ramate?

 22           MR. ROWE:  Objection.  Lacks knowledge.

 23           THE WITNESS:  For the dealership, yes, sir.

 24           THE COURT:  The dealership.

12:01PM 25       Now, Counsel, your objection?
```

1          MR. ROWE:  He lacks the basis of knowledge for that

2    information.

3          THE COURT:  Overruled.

4    Q    BY MR. NORMANDIN:  What were the other sources of

12:01PM 5    inventory that you saw at Ramate?

6    A    A dealer would purchase from outside, you know, like,

7    trade-ins --

8          THE COURT:  Just a moment.  Are you going over

9    Ramate yourself foundationally?  I mean, how do you know this?

12:01PM 10   Somebody telling you this?  You reading this or you personally

11   observing this?

12         THE WITNESS:  No, personal observation.  I was at

13   the lot.  I would have conversations with Cecilia and Raul.

14         THE COURT:  So you'd go over to Ramate?

12:02PM 15         THE WITNESS:  Yes, sir.

16         THE COURT:  Physically?

17         THE WITNESS:  Physically, yes, sir.

18         THE COURT:  Okay.  Counsel.

19         MR. ROWE:  Your Honor, if I could just state the

12:02PM 20   basis for knowing where the cars come from, that's hearsay.

21         THE COURT:  Yeah.  I sustained.

22   Q    BY MR. NORMANDIN:  You noticed vehicles on the Ramate lot

23   that were not floored by NextGear; correct?

24   A    That is correct.

12:02PM 25   Q    And you were able to observe the number of those vehicles

```
 1    not floored by NextGear; correct?

 2    A    Correct.

 3    Q    Based on your experience as an executive with next --

 4    account executive with NextGear, what are the other sources by

 5    the dealer?

 6    A    Generally it's their own cash that they have.

 7              MR. ROWE:  Objection, Your Honor.  Basis knowledge

 8    again, it's hearsay.

 9              THE COURT:  You can testify to that generally.

10         Overruled.  It's not specific as to Ramate.

11    Q    BY MR. NORMANDIN:  There came a point in time when Ramate

12    owed NextGear a substantial sum of money; correct?

13    A    That is correct.

14    Q    And has NextGear been repaid that money?

15    A    No, we have not.

16    Q    If you look at Exhibit 101, can you identify for us what

17    that SOT vehicle report is?

18              THE COURT:  This is 101?

19              MR. NORMANDIN:  Yes, Your Honor.

20              THE COURT:  What's the document labeled?

21              MR. NORMANDIN:  "SOT Vehicle Report."

22              THE COURT:  Thank you.

23    Q    BY MR. NORMANDIN:  What is an SOT Vehicle Report,

24    Mr. Rogers?

25    A    The SOT report is -- stands for sold out of trust, which
```

Timestamps in left margin: 12:02PM (line 5), 12:02PM (line 10), 12:03PM (line 15), 12:03PM (line 20), 12:03PM (line 25)

           1    these are vehicles that we verified that have been sold by the

           2    dealer and we were not paid for.

           3    Q     And you see the number of $205,666.43?

           4    A     Yes, I do.

12:04PM    5    Q     Is that the principal amount of money that has not been

           6    repaid by Ramate?

           7    A     That is the principal amount.

           8              MR. NORMANDIN:  Move 101 into evidence.

           9              THE COURT:  Just a moment.  I'd like to see 101 back

12:04PM   10    up on the screen.  And I'd like to see the line and what you're

          11    referring to, Counsel.  $11,500; is that correct?

          12              MR. NORMANDIN:  No, Your Honor.  That's the very

          13    bottom.

          14              THE COURT:  205,000.  Now I don't know what that

12:04PM   15    figure relates to, and I apologize.  But if I don't know, I

          16    want you to explain that to me.

          17    Q     BY MR. NORMANDIN:  You see that $205,666.43 on

          18    Exhibit 101?

          19    A     Yes.

12:05PM   20    Q     This is a total of all the vehicles that remained unpaid

          21    that were floored by NextGear; correct?

          22    A     Yes.

          23              THE COURT:  Just a moment.  Total of all vehicles

          24    not paid by Ramate?

12:05PM   25              MR. NORMANDIN:  Correct.

```
         1              THE COURT:  By Ramate?

         2              MR. NORMANDIN:  By Ramate.

         3              THE COURT:  All right.  Just a moment.  Just a

         4    moment, Counsel.  Be patient with me.

12:06PM  5         Counsel, let me ask you a question about this document.

         6         First, I don't see a large purchase like -- I'm sorry, a

         7    large lend like a Lamborghini.  But when I read this document,

         8    should I surmise -- would you shrink it a little bit and bring

         9    it to the top so you see the headings.

12:07PM 10         Now that's barely readable for a moment, so I want you to

        11    go up on that top line that's completely black, and I want you

        12    to blow that up again.  More.  Now move it over.  Okay.

        13    Original amount, principal balance, and I can't read the next

        14    line.  What's that, Counsel?

12:07PM 15              THE WITNESS:  It's "written off principal."

        16              THE COURT:  "Written off."  Okay.

        17         So you wrote $8,950 on this particular vehicle.  I think

        18    that's a Chevrolet.  Go over that 8,950.  Is that a Chevy?

        19    Yeah, that's the Chevy.  It's a Chevrolet; right?

12:07PM 20              MR. NORMANDIN:  Yes.

        21              THE COURT:  Right?

        22              THE WITNESS:  Yes, sir.

        23              THE COURT:  And you loan $8,950 to Ramate?

        24              THE WITNESS:  Yes, sir.

12:08PM 25              THE COURT:  And if I remember, because I'm doing it
```

```
 1   from memory, Counsel, go back over to the year -- all these are

 2   in 2011; is that correct?

 3             THE WITNESS:  Yes, sir.

 4             THE COURT:  Where's the Lamborghini in there?

 5             MR. ROWE:  Your Honor, the last few actually are

 6   2012 just for clarification.

 7             THE COURT:  Where's the Lamborghini?

 8             THE WITNESS:  The Lamborghini was not on the floor

 9   plan, it was part of their --

10             THE COURT:  Where's the Lamborghini?  You should

11   have this up on this list, shouldn't you?

12             THE WITNESS:  We didn't actually give money for the

13   Lamborghini.

14             THE COURT:  These are losses now, okay?  I've got a

15   Chevy El Dorado at $8,950, I'd sure be concerned about a

16   164,000 Lamborghini.  Why isn't that listed?

17             THE WITNESS:  Well, the --

18             THE COURT:  Answer my question.  Why isn't that

19   listed?

20             THE WITNESS:  It was not --

21             THE COURT:  Why isn't that listed?

22             THE WITNESS:  Because we haven't gotten the car and

23   sold.  It wasn't on the --

24             THE COURT:  Answer my question.  Why isn't that

25   listed?
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  It was not put on the floor plan.

 2              THE COURT:  Why?

 3              THE WITNESS:  Because the --

 4              THE COURT:  You have a Chevy El Dorado, $8,950.

 5    What about the $164,000 Lamborghini?

 6              THE WITNESS:  We didn't actually advance money for

 7    the Lamborghini.

 8              THE COURT:  Oh, so you really didn't lend on the

 9    Lamborghini, did you?  Listen to me carefully.  But you lend on

10    the Chevrolet.  Look at the first line.  You lent money on the

11    Chevrolet Silverado; correct?

12              THE WITNESS:  Correct.

13              THE COURT:  But you didn't lend money on the

14    Lamborghini, did you?

15              THE WITNESS:  Not directly.  No, sir.

16              THE COURT:  Well, just a moment.  Not directly.  So

17    you did it indirectly?

18              THE WITNESS:  No, we didn't lend money on it.  But

19    it was --

20              THE COURT:  You didn't lend any money on it?

21              THE WITNESS:  No.

22              THE COURT:  Then why are you telling me the

23    Lamborghini is related to this?

24              THE WITNESS:  Because it was part of their

25    inventory.  And Raul and Cecelia gave me that to cover their
```

The timestamps in the left margin are:
12:09PM (line 5)
12:09PM (line 10)
12:09PM (line 15)
12:10PM (line 20)
12:10PM (line 25)

UNITED STATES DISTRICT COURT

```
 1    debt.
 2            THE COURT:  So you didn't lend any money on this?
 3            THE WITNESS:  Not on the Lamborghini, no, sir.
 4            THE COURT:  Thank you.
 5    Counsel.
 6    Q    BY MR. NORMANDIN:  The last vehicle reflected on
 7    Exhibit 101 is a Mercedes-Benz; correct?
 8    A    That is correct.
 9    Q    In the amount of $49,107 lent; correct?
10    A    That is correct.
11    Q    When NextGear lends money to an auto dealer, it takes a
12    security interest in the vehicles that actually floors;
13    correct?
14    A    When it actually floors and all of its inventory no matter
15    where that inventory, is they grant us an interest in all their
16    inventory.
17    Q    And you're referring to the language in the demand
18    promissory note that's in evidence?
19    A    Yes, sir.
20    Q    In particular the language in Exhibit 106, which is in
21    evidence; correct?
22    A    That is correct.
23    Q    And Paragraph 2, which grants to DSC all assets and
24    inventory, whether owned now or hereafter?
25    A    That is correct.
```

12:10PM (line 5)
12:10PM (line 10)
12:10PM (line 15)
12:11PM (line 20)
12:11PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   Q    Okay.  And that language is the basis upon which NextGear
 2   is making a claim to Lamborghini?
 3   A    That and we also filed a UCC to --
 4             THE COURT:  No, just a moment.  Would you shrink
 5   that down, Counsel.  Thank you.
 6             And this is going to be Subsection A; is that correct?
 7             MR. NORMANDIN:  Yes, Your Honor.
 8             THE COURT:  Let's read together:
 9             "Grants to DSC together with its subsidiary,
10        its affiliates, assigns a continuing security
11        interest in all of dealer's assets and properties
12        wherever located.  Including without limitation all
13        equipment of any kind or nature, all vehicles,
14        vehicle parts, all inventory now owned or hereafter
15        acquired without limitation.  DSC-financed
16        inventory now owned or hereafter acquired and all
17        additions, successions, accessories, replacements
18        and proceeds thereof, all documents, accounts,
19        accounts receivable, channel paper and general and
20        tangibles now owed or hereafter acquired by dealer
21        together with the proceeds thereof, et cetera."
22        How did you acquire this vehicle again?  This
23   Lamborghini --
24             THE WITNESS:  The --
25             THE COURT:  -- without lending on it?
```

**UNITED STATES DISTRICT COURT**

```
         1              THE WITNESS: The owners gave me the title.

         2              THE COURT:  Well, just a moment.  They just walked

         3    up and gave you the title?

         4              THE WITNESS:  No.  I meant Cecilia, and she gave me

12:13PM  5    the title.

         6              THE COURT:  You went over and she gave you the title

         7    without any lending on your part.  In other words, I don't have

         8    a document --

         9          And Counsel, would you be kind enough to put up 101 again.

12:13PM 10          I don't have a document showing any lending, and I don't

        11    have any ledgers showing any loss by you.  What I have is you

        12    going over to Cecilia and she hands you the title; right?

        13              THE WITNESS:  And it is common practice for a dealer

        14    to --

12:13PM 15              THE COURT:  $164,000 Lamborghini?

        16              THE WITNESS:  Well, to give me a title in exchange

        17    to pay off other vehicles.

        18              THE COURT:  Thank you very much.

        19          Counsel.

12:13PM 20              MR. NORMANDIN:  Your Honor, to point the Court out,

        21    101 is the write-off report.  That's the loss, if you will, the

        22    principal loss.  So if we establish that through, that exhibit

        23    and Mr. Rogers' testimony, the language in 2-A that the Court

        24    went over granted a security interest in the Lamborghini.  So

12:14PM 25    we do have -- even though we didn't floor it, we have an
```

```
 1    interest in it sufficient to attach.

 2            THE COURT:  In other words, you have a document,

 3    somebody goes over, a pink slip is handed over.  And with no

 4    lending, no collateral, et cetera, you have this document that

12:14PM  5   you're relying on?

 6            MR. NORMANDIN:  It's not unusual for creditors of

 7    all kinds to take a security interest in the distributor's

 8    interest inventory.  Not unusual.  Even though they didn't

 9    manufacture it.

12:14PM 10           THE COURT:  Why don't you continue on with your

11    questions, Counsel.  You know I'm troubled by it.  I'm sending

12    you a very strong signal right now.  Now that's not a ruling,

13    that's a warning to you.  You might want to bolster your case

14    in that regard if you can.

12:15PM 15   Q    BY MR. NORMANDIN:  In the past, Mr. Rogers, when NextGear

16    was not paid the obligation from the dealer, did it undertake

17    generally steps to recover its collateral?

18    A    Yes, we did, one of which was taking owned inventory that

19    the dealer had and using that --

12:15PM 20           THE COURT:  Just a moment.  And that's what's

21    confusing me.  I don't understand the loss, as you said in your

22    opening statement to NextGear.  You said in opening statement,

23    "Judge, we have a harmed party here."  I was listening closely.

24    I'm concerned also.  We don't want to forfeit things.  Where is

12:15PM 25   the loss?
```

74

1      MR. NORMANDIN:  The loss is the -- the 15 or so

2 vehicles listed on 101 that was not repaid.

3      THE COURT:  No.  No.  Where is the loss concerning

4 the Lamborghini?  There's no collateral, there's nothing that

12:15PM 5 NextGear gives.  Where is the loss?

6      MR. NORMANDIN:  The loss is our inability to take

7 that, sell it, and apply those proceeds to the loss reflected

8 on the --

9      THE COURT:  To the loss reflected on the Chevrolet

12:16PM 10 Silverado, et cetera.

11      MR. NORMANDIN:  That's right, Your Honor.

12      THE COURT:  Why is a dealer, then -- and I -- I'm

13 giving you a preview of some problems I've got right now.  This

14 is a huge courtesy.  Why is a dealer -- why is the argument

12:16PM 15 going to be that this Lamborghini was contingent upon -- the

16 sale was contingent upon paying off these $200,000 when the

17 other testimony is we have 1,030 transactions of automobiles?

18      MR. NORMANDIN:  We had 1,030 transactions of

19 automobiles.  All of those are paid except for the list on 101.

12:16PM 20      THE COURT:  Thank you, Counsel.

21      **(Proceedings further reported by Debbie Gale**

22      **at 12:16 p.m. in Volume II.)**

23      **--oOo--**

24

25

**UNITED STATES DISTRICT COURT**

1      *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  September 28, 2015*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN_*

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**